[No. 11692.   Department One.   December 12, 1914.]

THE STATE OF WASHINGTON, *Respondent*, v. FRANK I. SEFRIT, *Appellant*.[1]

VENUE — CHANGE—BIAS OF JUDGE — DISQUALIFICATION. Upon an affidavit for a change of judges on account of the bias of the trial judge, and asking that a judge of some other county be called because the judge of department No. 2 would be called as a witness, the trial judge has no jurisdiction other than to send the case to the judge of department No. 2; since he cannot pass upon the qualifications of such judge.

JUDGES—DISQUALIFICATION—JUDGE AS WITNESS. In making an affidavit to disqualify a trial judge on the ground that he would be a witness in the trial, the defendant, especially in a criminal case, need not divulge any part of his evidence in advance of the trial; nor should a judge be required to pass upon the materiality or admissibility of his own testimony.

APPEAL—REVIEW—HARMLESS ERROR. Error in overruling a motion to call in a new judge, because of the disqualification of the trial judge by reason of the fact that he would be called as a witness at the trial, is not prejudicial where, when called to testify, the trial judge ruled, as the fact was, that the matter was entirely immaterial.

LIBEL AND SLANDER—CRIMINAL PROSECUTIONS—MALICE—TRUTH OF CHARGE—INFORMATION—SUFFICIENCY. Malice being the gist of the offense of criminal libel at common law and under Rem. & Bal. Code, § 2424, defining the offense as a "malicious publication" without making any reference to the truth or falsity of the publication, it is not necessary to allege in the information that the publication was false; especially in view of Id., § 2425, providing that every publication having the tendency mentioned in § 2424 shall be deemed malicious unless justified or excused, and that such publication is

[1]Reported in 144 Pac. 725.

justified when the matter charging the commission of a crime is true, and was published with good motives and with justifiable ends; since the truth is made material for the first time only as a defense overcoming the presumption of malice.

SAME—CRIMINAL LIBEL—LIBELOUS PER SE. A publication is criminally libelous *per se*, where it charges a prosecuting attorney with the crime of nonfeasance in office in wilfully neglecting to prosecute a criminal, and tends to expose him to hatred, contempt, or ridicule, or deprive him of public confidence.

SAME—CRIMINAL PROSECUTION—MALICE—PRIVILEGED COMMUNICATIONS—STATUTORY PROVISIONS. A publisher of a newspaper is afforded no immunity for the publication of matter libelous *per se* different from the immunity afforded other persons, by Rem. & Bal. Code, § 2430, providing that communications between persons concerned therein or who stood in such a relation as to offer reasonable ground for supposing an innocent motive, shall not be presumed malicious, but shall be termed privileged communications.

SAME—CRIMINAL PROSECUTION—MALICE — JUSTIFICATION — ISSUES AND PROOF—BURDEN OF PROOF OF MALICE. Though the occasion be one of privilege, but the publication itself was not privileged in that it charged a crime and imputed moral delinquency to a public officer, an information charging that the publication was maliciously and unlawfully printed is sufficient to put in issue the good faith of the publication as a justification; and when there was evidence tending to establish the defense, the question of actual or express malice was a question for the jury, with the burden of proof beyond a reasonable doubt upon the state.

SAME—CRIMINAL LIBEL—PRIVILEGE—REPORTS OF COURT PROCEEDINGS—STATUTORY PROVISIONS. Rem. & Bal. Code, § 2428, providing that no prosecution for libel shall be maintained against a publisher of a newspaper for the publication therein of a fair and true report of any judicial  .  .  .  .  proceeding, the privilege is to be confined strictly to a fair report of the actual proceedings in court, and is no defense to the publication of a charge that a prosecuting attorney refused to prosecute a criminal, the purport of which was not to report proceedings but to criticise the official.

SAME — CRIMINAL LIBEL — MALICE — JUSTIFICATION—ISSUES—EVIDENCE—ADMISSIBILITY. In a trial for criminal libel, upon an issue of justification, evidence of investigations by the defendant of other charges against the prosecuting witness, as showing grounds of defendant's lack of confidence in the prosecuting witness, are inadmissible, as they are irrelevant to the issue of malice or absence thereof in the admitted publication, or to the issues of justification by proof of the things charged and excuse by belief in the truth, based upon a fair and impartial investigation.

SAME. Such evidence is not admissible on the theory that it bore upon a general charge of official misconduct alleged in the first sentence of the information, where, read in its context, the information cannot be so construed.

SAME—EVIDENCE—JUSTIFICATION—ADMISSIBILITY. Upon a prosecution for criminal libel in the publication of an article relating to the conduct of the prosecuting attorney in the prosecution of a cause, evidence is inadmissible as to a story related to the defendant on the subject of wrongs by the prosecuting attorney in a civil cause not relating to his official duties (which story was included in the publication) in the absence of evidence of its truth, or of its investigation by the defendant and belief in its truth; as it would be but hearsay and insufficient as justification or excuse.

WITNESSES—CROSS-EXAMINATION—SCOPE—MATTER OF DEFENSE. In a prosecution for criminal libel, it is not error to refuse to allow the prosecuting witness to be cross-examined in relation to the truth of the publication, which was a matter of defense.

LIBEL AND SLANDER—CRIMINAL PROSECUTION — EVIDENCE — PRIMA FACIE CASE. In a prosecution for the publication of matter libelous *per se*, passing beyond any occasion of privilege, an admission of its publication and general circulation of the paper, together with the tendency of the article itself, is sufficient to make a *prima facie* case to be submitted to the jury.

SAME—EVIDENCE—EXPRESS MALICE—SUFFICIENCY. In a prosecution for criminal libel, evidence that the defendant, in an altercation with the prosecuting witness, had threatened to "show you up yet," and had said "I will get you yet," is some evidence of express malice, sufficient to go to the jury. ·

SAME—CRIMINAL LIBEL—TRIAL—ISSUES — INSTRUCTIONS. Where, in a prosecution for libel, in publishing of a prosecuting attorney that he had refused to prosecute a rapist, a vital question in the case was the question of the sufficiency of the evidence which the prosecuting witness might have secured in corroboration of the girl's story, going to the good faith of the defendant in publishing the article, and the good faith of the prosecuting witness in refusing to prosecute the rapist, it is reversible error for the court, after instructing that no conviction could have been had for the offense of rape without corroboration of the female, to single out one incident in a long chain of circumstances (all having a clear corroborative tendency connecting the rapist with the offense, and which the complaining witness could have ascertained by a reasonable investigation of the facts) and instruct the jury that such incident did not, as a matter of law, constitute corroborative evidence of the commission of the crime of rape.

RAPE—CORROBORATION—EVIDENCE—SUFFICIENCY. The fact that the one accused of the rape of a girl under fifteen years of age, was found with the girl, locked in a bath room, in connection with other circumstances showing intimacy, and that accused had persistently followed the girl and finally secretly obtained possession of her, is sufficient corroborative evidence of the testimony of the girl that she had been raped after being taken by the accused to his home.

LIBEL AND SLANDER—CRIMINAL LIBEL—TRIAL—ISSUES—INSTRUC-TIONS. Where, in a prosecution for libel, in publishing of a prose-cuting attorney that he had refused to prosecute a rapist, a vital question in the case was the question of the sufficiency of the evidence which the prosecuting witness might have secured in corroboration of the girl's story, going to the good faith of the defendant in publishing the article, and the good faith of the prosecuting witness in refusing to prosecute the rapist, it is reversible error to instruct the jury that, if they found that the only evidence of corroboration of the girl's story was the evidence of witnesses to prove the existence of opportunity and that of physicians able to testify from a physical examination that the crime had been committed by some one, then such corroboration was not, as a matter of law, sufficient corroborating evidence to convict the accused; where the record not only discloses these facts, but many other facts, all of which constituted a chain of corroborative circumstances; since it singles out the mere circumstances of opportunity and the girl's condition, and carries the inference that no other evidence could have been procured by the prosecuting attorney tending to corroborate the girl's story; especially in view of the fact that the prosecuting attorney had been allowed to testify that he had laid before a superior court judge and the attorney general of the state a hypothetical case, in which the corroborative evidence was confined to evidence of acquaintance, opportunity, and the physical condition of the girl, and that in each instance he had been advised that such corroboration was insufficient to convict; since the judge, if he desired to mention any of the circumstances, should have mentioned all of them.

SAME—CRIMINAL LIBEL—INSTRUCTIONS—CONSIDERING PUBLICATION AS A WHOLE. In a prosecution for libel in publishing of B., a prosecuting attorney, that he had refused to prosecute a rapist, including also a statement that "Is it true, as is charged by a woman who claims that B. wronged her aged mother . . . . in disposing of an estate . . . . that F. (the rapist) knows too much about B., an instruction that, if the jury find the above language, when used in connection with the balance of the published article, refers to B. as a private citizen or an attorney at law, and that the same tends to expose the said B. as such citizen or attorney to hatred, contempt, or obloquy, or to deprive him of the benefit of

public confidence, the defendant was not privileged to publish such language under the law of privilege as heretofore defined (relating to libel of one acting in an official capacity) and the publication is deemed malicious and cannot be excused as excuse was heretofore defined, and the burden of proof is upon the defendant to show that he published the same without malice, is not erroneous in that it authorized the jury to consider part of the publication separate and apart from the other portions; since its clear import was to require the consideration of matter relative to B.'s private capacity in connection with the balance of the article.

SAME—INSTRUCTIONS—PRIVILEGE. Such instruction is not erroneous in that it deprived defendant of his privilege, since reflection upon the acts as a private citizen are not within the privilege in case of fair discussion upon a person's conduct in respect of public affairs.

SAME—INSTRUCTIONS—MALICE. Such instruction is not erroneous in that it takes from the jury the question of malice, since it but declares the rule of the statute providing that malice is presumed, in which case the burden of proof is shifted to the defendant.

SAME—CRIMINAL LIBEL—EXCUSE. The fact that a publication libelous *per se* disclaims knowledge of the facts stated, and declares they are so serious as to be difficult of belief, is no excuse or defense for the publication.

Appeal from a judgment of the superior court for Whatcom county, Pemberton, J., entered May 26, 1913, upon a trial and conviction of criminal libel. Reversed.

*Newman & Kindall*, for appellant.

*Frank W. Bixby, Walter A. Martin, William J. Biggar,* and *Thomas R. Waters*, for respondent.

ELLIS, J.—The defendant was tried for criminal libel, upon an amended information, the substance of which was as follows:

"Defendant at Bellingham, Washington, on or about the 12th day of January, 1913, did then and there compose, print and publish in the Sunday American-Reveille a certain editorial as follows, to wit:

" 'WHY DOES PROSECUTOR DEFEND A RAPIST?

" 'Many of the people of Whatcom county are wondering if they are not misplacing their confidence when they repose

it in Frank W. Bixby as a conscientious and unbiased official.

" 'The action of Bixby in the case of Walter Fulcher, self-confessed rapist, is bringing many to believe that Bixby must have some personal motive in extending his protection to that scoundrel.

" 'Now, why is it?

" 'Is it true, as is charged by a woman who claims that Bixby has wronged her aged mother and herself in the matter of disposing of an estate of one of Bixby's clients, that Walter Fulcher "knows too much about Bixby."

" 'We do not know the facts of that affair and do not subscribe to the accuracy of the charges that are made. Indeed, the charges are so serious that it is difficult to credit them, but it is certainly strange that the prosecuting attorney of Whatcom county should be so keenly interested in a criminal of the type of Walter Fulcher.

" 'Fulcher ruined a fourteen-year-old girl, a mere child, who was homeless and had sought shelter in his house. The girl says Fulcher's wife, or a woman supposed to be his wife, abetted in that crime. Both Fulcher and the woman with whom he has been living for a number of years, belong to an organization whose idea of society is that there is nothing sacred in the marriage relation. They are practical "free-lovers."

" 'The wronged girl has for more than a year been in charge of Christian people of Seattle. She has been treated at a Seattle hospital for physical derangements due to Fulcher's lust. She is a wreck morally, physically and spiritually. One who knows the case well says it is one that will wring tears from the eyes of the hardest criminal.

" 'When the crime of Fulcher was made known a warrant was asked for Fulcher's arrest.

'Prosecuting attorney Bixby refused to order it; he said there was no corroborating evidence. In this, we believe, he misstated the facts, possibly not knowing he was doing so.

" 'Parties interested in the case, two well known ministers, were insistent, but Bixby was obdurate, and while there was parleying Fulcher skipped out. Some believe he was aided in making his escape by men deeply obligated to him.

" 'Be that as it may, no attempt was made to punish him for his crime until a few months ago when he was located in a remote hamlet of Oregon, near Coos Bay. He told an offi-

cer, after his arrest, that his whereabouts were known to Bixby and others and he was surprised that a warrant was issued for him.

" 'After being brought to Bellingham he went before Judge Hardin and formally pleaded guilty, receiving a sentence of six years in the state's prison. Even after appearing in court and entering the plea of guilt he was defended by prosecuting attorney Bixby who asked the court to be lenient.

" 'Fulcher now states that he has the promise of Bixby to secure his release from prison within the year, yet his victim is a physical and moral wreck for life.

" 'Fulcher was arrested at Vancouver, Washington, on a "John Doe" warrant sworn to by Rev. E. S. Chappell, the local representative of the Washington Children's Home Society. This was done on the advice of Rev. Mr. Covington, the head of the organization at Seattle. Both are well known in this county as Christian gentlemen. Both of these workers in the cause of hapless children are familiar with the crime of Fulcher.

" 'It is stated to the American-Reveille that Fulcher was brought to Vancouver by a woman detective, expecting to keep an unlawful appointment with her. He is also to be desired for his participation in another crime, and, that he will be charged with this crime in due course.

" 'Prosecuting attorney Bixby was not informed of the issuing of the warrant for Fulcher because he previously had declined to issue a warrant. It was believed he would not approve of the warrant if the matter were presented to him.

" 'The warrant was sent to the sheriff of Clarke county, and as one of the deputies of the local sheriff's office was in Portland on a visit at the time of the appearance of Fulcher in Vancouver, he was instructed to take charge of the prisoner and bring him here for trial.

" 'Bixby knew nothing of the matter until he visited the county jail and ran into the man. Those who saw the meeting say the prosecuting attorney was much surprised.

" 'No doubt of it! He knew he was up against what the gamblers call a "show down."

" 'The friends of the outraged child were ready with the proof to convict the man. They knew of the prisoner's confession of guilt. They were prepared, it is stated, to appeal

to the attorney general if Bixby continued to befriend the scoundrel. But all of that trouble was obviated by Fulcher going into court and entering a plea of guilt. He admitted the charge and asked for mercy. He even had the unspeakable gall, after all that transpired, to say he had been seduced! And Bixby stood in the court room pleading for mercy for the man!.

" 'The American-Reveille would be pleased to give Bixby or any one for him all the space he may require to give the reason for this friendship for this self-confessed scoundrel.

" 'But what is the sequel?

" 'The prosecutor now wants sheriff Thomas to dismiss chief deputy Larry Flannagan from his service. He says Flannagan does not work with him! He specifically said he was disappointed because he was not consulted about the arrest of Fulcher!

" 'Sheriff Thomas knows that his chief deputy has only done his duty and he positively refused to dismiss him.

" 'To have done so would have been a crime, of course, and in saying so the American-Reveille holds no brief for Larry Flannagan. We suspect that he is too well known to the people of Whatcom county to need defense against the insinuations of Mr. Bixby.

" 'He had nothing to do with the issuing of the warrant. He merely had it served.

" 'But the prisoner was Bixby's friend and therein lies the cause, or one of the causes, for Bixby's displeasure.

" 'It is stated about the court house that Bixby proposes to have sheriff Thomas' payroll held up by the county commissioners if it contains the name of deputy sheriff Flannagan.

" 'We do not believe the two new commissioners will stoop to such a thing. The hold-over will not do so, either. They are not likely to permit themselves to be so misled. Those who vouch for Messrs. Shagrin and Legoe say they are men of honor and of official courage. This must be, and will be, believed until the contrary is shown, and in view of the outlook Mr. Bixby will not be able to punish a competent and faithful officer for doing his duty, even if it was to bring to the scene of his crime, after having been arrested by the sheriff of another county, a tillicum of prosecuting attorney Bixby.'

"That certain portions of said editorial so composed, written and published, or caused to be composed and published, by the said Frank I. Sefrit in the said Sunday American-Reveille, were malicious, libelous, and were wilfully, unlawfully, and maliciously composed, printed and published in the said Sunday American-Reveille by the said defendant Frank I. Sefrit. of and concerning Frank W. Bixby in his capacity as a private citizen, in his professional capacity as a practicing attorney at law, and in his official capacity as prosecuting attorney of Whatcom county, Washington; that the said certain portions so referred to as being malicious, libelous and wilfully, unlawfully and maliciously composed, printed and published by the said Frank I. Sefrit of and concerning the said Frank W. Bixby are as follows, to wit:

" 'Why Does Prosecutor Defend a Rapist?

" 'Many of the people of Whatcom county are wondering if they are not misplacing their confidence when they repose it in Frank W. Bixby as a conscientious and unbiased official.

" 'The action of Bixby in the case of Walter Fulcher, self-confessed rapist, is bringing many to believe that Bixby must have some personal motive in extending his protection to that scoundrel.

" 'Now why is it?

" 'Is it true, as is charged by a woman who claims that Bixby has wronged her aged mother and herself in the matter of disposing of an estate of one of Bixby's clients, that Walter Fulcher "knows too much about Bixby?"

" 'We do not know the facts of that affair and do not subscribe to the accuracy of the charges that are made. Indeed, the charges are so serious that it is difficult to credit them, but it is certainly strange that the prosecuting attorney of Whatcom county should be so keenly interested in a criminal of the type of Fulcher. . . .

" 'When the crime of Fulcher was made known a warrant was asked for Fulcher's arrest.

" 'Prosecuting attorney Bixby refused to order it; he said there was no corroborating evidence. In this, we believe, he misstated the facts, possibly not knowing he was doing so.

" 'Parties interested in the case, two well known ministers, were insistent, but Bixby was obdurate, and, while there was parleying Fulcher skipped out. Some believe he was aided in making his escape by men deeply obligated to him.

" 'Be that as it may, no attempt was made to punish him for his crime until a few months ago when he was located in a remote hamlet of Oregon, near Coos Bay. He told an officer, after his arrest, that his whereabouts were known to Bixby and others and he was surprised that a warrant was issued for him. . . . Even after appearing in court and entering the plea of guilt he was defended by prosecuting attorney Bixby who asked the court to be lenient.

" 'Fulcher now states that he has the promise of Bixby to secure his release from prison within the year. . . .

" 'Prosecuting attorney Bixby was not informed of the issuing of the warrant for Fulcher because he previously had declined to issue a warrant. It was believed he would not approve of the warrant if the matter were presented to him. . . .

" 'Bixby knew nothing of the matter until he visited the county jail and ran into the man. Those who saw the meeting say the prosecuting attorney was much surprised.

" 'No doubt of it! He knew he was up against what the gamblers call a "show down." (Meaning thereby that he, the said Frank W. Bixby was at the end of his game of secrecy and protection from the said Walter Fulcher, and all of his machinations heretofore known only to the said Walter Fulcher were now about to be exposed; that is, that the cards were to be turned face up so that all who desired might inspect the same.) . . .

" 'They were prepared, it is stated, to appeal to the attorney general, if Bixby continued to befriend the scoundrel. . . . And Bixby stood in the court room pleading for mercy for the man!

" 'The American-Reveille would be pleased to give Bixby or any one for him all the space he may require to give the reason for this friendship for this self-confessed scoundrel.

" 'But what is the sequel?

" 'The prosecutor now wants sheriff Thomas to dismiss chief deputy Larry Flannagan from his service. He says Flannagan does not work with him! He specifically said he was disappointed because he was not consulted about the arrest of Fulcher!

" 'Sheriff Tomas knows that his chief deputy has only done his duty and he positively refused to dismiss him.

" 'To have done so would have been a crime, of course. And in saying so the American-Reveille holds no brief for Larry Flannagan. We suspect that he is too well known to the people of Whatcom county to need defense against the insinuations of Mr. Bixby.

" 'He had nothing to do with the issuing of the warrant. He merely had it served.

" 'But the prisoner was Bixby's friend and therein lies the cause, or one of the causes, for Bixby's displeasure.

" 'It is stated about the court house that Bixby proposes to have sheriff Thomas' payroll held up by the county commissioners if it contains the name of deputy sheriff Flannagan.

" 'We do not believe the two new commissioners will stoop to such a thing. The hold-over will not do so, either. They are not likely to permit themselves to be so misled. Those who vouch for Messrs. Shagrin and Legoe say they are men of honor and of official courage. This must be, and will be, believed until the contrary is shown, and, in view of the outlook Mr. Bixby will not be able to punish a competent and faithful officer for doing his duty, even if it was to bring to the scene of his crime, after having been arrested by the sheriff of another county, a tillicum of prosecuting attorney Bixby.' (Meaning thereby that the said Walter Fulcher was a chum—an old and intimate friend of the said Frank W. Bixby.)

"That said Sunday American-Reveille is a newspaper of general circulation in Whatcom county and adjacent territory and said article was read by various persons therein.

"That said paper is published by the Bellingham Publishing Company of which the said defendant was at the time general manager.

"That said editorial tended to expose Frank W. Bixby in his capacity as a private citizen, in his official capacity as prosecuting attorney of Whatcom county, and in his professional capacity as a practicing attorney at law, to hatred, contempt, ridicule and obloquy and to deprive him of the benefit of public confidence and social intercourse."

At the trial the defendant admitted that the Sunday American-Reveille is a newspaper of general circulation in Whatcom and adjoining counties; that the article was read

by various persons therein; that the paper was on January 12, 1913, and prior and subsequent thereto, published by the Bellingham Publishing Company, a corporation; and that the defendant was on that date, and prior and subsequent thereto, the general manager of that company.

On February 28, 1913, the defendant, in department No. 1 of the superior court for Whatcom county, where the information was originally lodged, moved that a judge be called from some other county for the trial of the cause. The motion was based upon an affidavit which recited that the judge of department No. 1 was prejudiced against the defendant; and on the further ground that the judge of department No. 2 of the superior court for Whatcom county would be called upon the trial as a witness in defendant's behalf. The court in department No. 1 ordered the cause to be transferred to department No. 2, but refused to call a judge from another county. On March 4, in department No. 2, the defendant moved that a judge from some other county be called to preside at the trial, for the reason that the Honorable William H. Pemberton, the judge presiding in department No. 2, would be called as a material and necessary witness. Judge Pemberton, on March 12, denied the motion on the ground that no fact or facts appeared from the motion, or otherwise, concerning which it was proposed to call him as a witness, and that it did not appear from the motion or otherwise, that the proposed testimony was either material or necessary, or whether it would be merely cumulative. On April 14, the defendant interposed a demurrer to the information, upon the ground that it does not substantially conform to the requirements of the statute; that more than one crime is charged; that the facts charged do not constitute a crime; and that the information contains matter, which if true would constitute a defense or legal bar to the action. The demurrer was overruled. The defendant entered a plea of not guilty. The cause was tried to the court and a jury. The jury found the defendant guilty, and he was sentenced

to pay a fine of $825 and costs, and to ten days' imprisonment in the county jail at hard labor. From the judgment and sentence, the defendant appeals.

I. The appellant insists that either one or both of the judges of the superior court for Whatcom county erred in refusing to call another judge to try this case, upon the suggestion supported by affidavit that the judge of department No. 2 would be called as a witness. It would seem, however, that the judge of department No. 1, when disqualified by an affidavit of prejudice, had no discretion to do anything but transfer the cause. Being disqualified, we should hesitate to hold that he had any power to pass upon the qualifications of the judge of department No. 2. As to the disqualification of the judge of department No. 2 by an affidavit stating that he would be called as a necessary witness, a closer question is presented. It is undoubtedly the law, as sustained both by reason and authority, that a judge cannot, over the objection of a party, be a witness in an action tried before him, in the absence of a statute so providing. *State v. Houghton,* 45 Ore. 110, 75 Pac. 887; *People v. Dohring,* 59 N. Y. 374, 17 Am. Rep. 349; *Rogers v. State,* 60 Ark. 76, 29 S. W. 894, 46 Am. St. 164, 31 L. R. A. 465. Such is the established rule in this state. *Maitland v. Zanga,* 14 Wash. 92, 44 Pac. 117.

The respondent, however, urges that the affidavit was insufficient in that it failed to show what testimony the judge would be called upon to give; that the judge, therefore, could not know in advance whether his testimony was material or immaterial, or whether his testimony would be merely cumulative. One authority sustaining this view by language used *arguendo* is cited. *Gray v. Crockett,* 35 Kan. 66, 10 Pac. 452. In that case, however, a change of venue was actually granted, and that action was held not an abuse of discretion, since the judge was presumed to have acted upon his own knowledge as to what he could testify to. In view of the ease with which another judge may be secured in this state

without an actual change of venue, we think it would be an unnecessary hardship upon a defendant, especially in a criminal action, to require him to divulge any part of his evidence in advance of the trial, or forfeit the right to use it. This is hardly met by the suggestion that to hold otherwise would enable a party to disqualify every judge in the state by offering to call him as a witness. The *mala fides* of an attempt to so disqualify several judges successively would be apparent on the face of the thing. Conduct so reprehensible can hardly be anticipated. The very attempt should subject the attorney to summary discipline. Moreover, as pointed out in the *Maitland* case, a judge should not be required to pass upon the materiality or admissibility of his own testimony. This he would have to do upon the theory advanced by the respondent.

When in the course of the trial the judge was actually called to testify, he held that the matter concerning which his testimony was offered was immaterial. It related to a matter wholly foreign to anything set out in the alleged libelous article. We are constrained to hold that it was inadmissible on any sound theory. It would seem, therefore, that the error complained of was not prejudicial.

II.   The appellant contends that the information was insufficient in law (a) in that it did not allege the falsity of the facts set forth in the publication, and (b) in that it showed on its face that the occasion was one of privilege negativing any inference of malice, and that there was no sufficient allegation of malicious intent.

(a)   At common law, the truth of a libelous charge, though usually a defense to a civil action for damages, was no defense to a criminal prosecution. This is now generally conceded. *State v. Mays*, 57 Wash. 540, 107 Pac. 363; 18 Am. & Eng. Ency. Law (2d ed.), p. 1068; 2 Wharton, Criminal Law (10th ed.), § 1643; Newell, Slander and Libel (2d ed.), p. 597; 25 Cyc. 573.

"It is immaterial with respect to the essence of a libel whether the matter of it be true or false." 4 Blackstone Commentaries, p. 150.

Since the falsity of the libelous charge was not an essential element at common law, obviously the negation of its truth was not a necessary part of the information.

"It is not necessary to allege that the matter published is false; and such an allegation need not be proved though it be made on the record. But the illegality of the publication must be averred by means of the word maliciously, or by some equivalent term." Newell, Slander and Libel (2d ed.), p. 974.

The common law, so far as not inconsistent with the institutions and statutes of this state, constitutes the rule of decision in the courts of this state (Rem. & Bal. Code, § 143; P. C. 81 § 1), and supplements the penal statutes of this state. Rem. & Bal. Code, § 2299 (P. C. 135 § 93); *State v. Mays, supra*. According to the preponderance of modern authority, malice is the essence or gist of the offense of libel. 18 Am. & Eng. Ency. Law (2d ed.), p. 998; 25 Cyc. 571; Newell, Slander and Libel (2d ed.), pp. 322, 323.

Our statute, so far as here material, defines libel as follows:

"Every malicious publication by writing, printing, picture, effigy, sign or otherwise than by mere speech, which shall tend:

"(1) To expose any living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse; or   .   .   .

"(3) To injure any person, corporation or association of persons in his or their business or occupation, shall be a libel. Every person who publishes a libel shall be guilty of a gross misdemeanor." Rem. & Bal. Code, § 2424 (P. C. 135 § 343).

It is obvious that malice is the gist of the offense as defined by this statute. The truth or falsity of the publication is only material as bearing upon the question of malice. It is also obvious that the publication here in question was

under this definition libelous *per se*. It charged a crime, namely, nonfeasance in office, by charging a willful neglect to perform an official duty. Rem. & Bal. Code, § 2268 (P. C. 135 § 31). It had every tendency set forth in the part of the statutory definition above quoted. It tended to expose the complaining witness to hatred, contempt, ridicule, and obloquy, and to deprive him of the benefit of public confidence and social intercourse. It tended to injure him in his business or occupation as an attorney at law. Every such publication, when malicious, is libelous *per se*. *State v. Norton*, 109 Minn. 99, 123 N. W. 59. The principal difference between this statute and our own former statute (Rem. & Bal. Code, § 2777) is, that the former statute did not make malice an essential element of the crime, while the present statute does. A publication libelous *per se* under the former statute is clearly so under the present act which, though making malice an element, also raises the presumption of malice from the tendency of the publication, unless justified or excused. The case of *Byrne v. Funk*, 38 Wash. 506, 80 Pac. 772, therefore, clearly supports the view that the publication here in question was libelous *per se*. That malice is the gist of the offense under our statute is made manifest by the fact that the next section of the code (Rem. & Bal. Code, § 2425; P. C. 135 § 345), recognizing and defining the defenses of justification and excuse, makes these defenses, when established, a negation of the presumption of malice.

"Every publication having the tendency or effect mentioned in section 2424 shall be deemed malicious unless justified or excused. Such publication is justified whenever the matter charged as libelous charges the commission of a crime, is a true and fair statement, and was published with good motives and for justifiable ends. It is excused when honestly made in belief of its truth and fairness and upon reasonable grounds for such belief, and consists of fair comments upon the conduct of any person in respect of public affairs made after a fair and impartial investigation." Rem. & Bal. Code, § 2425 (P. C. 135 § 345).

The truth of the libelous charge is thus made material for the first time, and only as a defense overcoming the presumption of malice arising from the tendency of the publication. The allegation of malice in the information, therefore, implies falsity, and puts in issue the truth of the thing charged in the publication, where it is of a nature that proof of the truth makes justification, or where its occasion as one of privilege, that is, fair comment touching a person in respect to public affairs, makes its truth, or a belief in its truth after fair and impartial investigation, an excuse rebutting the presumption of malice. Since falsity is no part of the crime at common law, and is not made so by our statute, but the truth is merely a defense negativing malice, it is clear that, where the information alleges express malice, the lack of an express allegation that the publication was false does not render the information demurrable.

(b) The information, after setting out the publication in full, charges that certain portions thereof were malicious and libelous, and were willfully, unlawfully and maliciously composed, printed, and published. The appellant contends, if we have correctly caught his meaning, that because of the peculiar position which he as manager of the newspaper occupied to the public, he had a broader privilege than that accorded to other persons in the criticism of public officers and candidates for public office. It is urged that the statute (Rem. & Bal. Code, § 2430; P. C. 135 § 355), accorded that privilege. It reads as follows:

"Every communication made to a person entitled to or concerned in such communication, by one also concerned in or entitled to make it, or who stood in such relation to the former as to offer a reasonable ground for supposing his motive to be innocent, shall be presumed not to be malicious, and shall be termed a privileged communication."

This is but a statutory declaration of the general doctrine of qualified privilege which exists independent of any statute, and applies alike to all persons related to and interested

in the subject-matter of a publication. Newell, Slander and Libel (2d ed.), pp. 388, 389; 25 Cyc. 385. It affords no immunity to a publisher of a newspaper for the publication of matter libelous *per se* different from that which it affords to any other person. As said by Champlin, J., in *Bronson v. Bruce*, 59 Mich. 467, 26 N. W. 671, 60 Am. Rep. 307:

"The publisher of a newspaper, possesses no immunity from liability in publishing a libel, other or different than any other person. The law makes no distinction between the newspaper publisher, and any private person who may publish an article in a newspaper or other printed form; and if either abuses the right to publish his sentiments on any subject and upon any occasion, he must defend himself upon the same legal ground."

In another case the same court, speaking through Morse, J., said:

"The liberty of the press, as the law now stands, is only a more extensive and improved use of the liberty of speech which prevailed before printing became general; and, independently of certain statutory provisions, the law recognizes no distinction in principle between a publication by the proprietor of a newspaper and a publication by any other person. A newspaper proprietor is not privileged, as such, in the dissemination of the news, but is liable for what he publishes in the same manner as any other individual. Townsd., Sland. & Lib., § 252." *McAllister v. Free Press Co.*, 76 Mich. 338, 43 N. W. 431, 15 Am. Rep. 318.

See, also, *Detroit Daily Post Co. v. McArthur*, 16 Mich. 447. The basis and extent of the rule of privilege, as applied to publications touching officers and candidates for public office, is to be found in considerations of public policy. Newell, Slander and Libel (2d ed.), p. 389. The public interest requires that the discussion of the fitness of a candidate, mentally or physically, for the office to which he aspires shall be untrammeled. In such case, the good faith or malice of the publication is immaterial. It is also to the public interest that the acts and conduct of an official or a candidate for office be freely criticized without liability for

such criticism, provided the criticism be *bona fide* and the acts or conduct criticized are proven to be true. *Sweeney v. Baker*, 13 W. Va. 158, 191, 31 Am. Rep. 757. After so holding in the case last cited, the court continues:

"But public policy forbids, that the moral character of such a candidate should be falsely assailed in the newspapers, or that he should be falsely charged by publication in newspapers with crimes. If the newspaper press was allowed to be licentious, the result would be, to drive from the control of newspapers all men of character, and to deter from seeking office all but the profligate and abandoned. Nor would the result be different, if a belief in the facts, on which such false and libelous allegations were based, was held to be a legal excuse for publications of this character against such candidates. To justify such a publication, it must be proven that the allegation is true in fact."

See, also, 25 Cyc. pp. 402, 403, 404; Newell, Slander and Libel (2d ed.), pp. 533, 534; *Commonwealth v. Clap*, 4 Mass. 163, 3 Am. Dec. 212; *Wheaton v. Beecher*, 66 Mich. 307, 33 N. W. 503; *Bourreseau v. Detroit Evening Journal Co.*, 63 Mich. 425, 30 N. W. 376, 6 Am. St. 320.

"A communication imputing the commission of a criminal offense or of moral delinquency to a public officer, even in the discharge of his official duties, is therefore not privileged, and the only defense for so doing is that same is true, and, in addition, was published from good motives and for justifiable ends. If the communication is in fact untrue, the motive with which it is published is wholly immaterial." *Oakes v. State*, 98 Miss. 80, 54 South. 79, 33 L. R. A. (N. S.) 207.

Aside from the provisions of our statute (Rem. & Bal. Code, § 2425; P. C. 135 § 345), according and defining the defenses of justification and excuse, and except in the case of special privilege in publishing reports of judicial, legislative, or other public and official proceedings, etc., accorded by Rem. & Bal. Code, § 2428 (P. C. 135 § 351), the general rule of privilege is, we believe, correctly interpreted by this court in *Byrne v. Funk, supra*. In that case, quoting

from 18 Am. & Eng. Ency. Law (2d ed.), p. 1041, the rule is thus stated:

"The official acts of public officers may lawfully be made the subject of fair comment and criticism, not only by the press, but by the members of the public. But the prevailing rule is that charges imputing a criminal offense or moral delinquency to a public officer cannot, if false, be privileged, though made in good faith, and this though the charge relates to an act of the officer in the discharge of his official duties."

This general rule of privilege has not been enlarged by our statute, which merely adds the defense of excuse to that of justification which existed at common law. Where a crime is charged by a publication, it is, under our statute, justified only by proof that it "is a true and fair statement and was published with good motives and for justifiable ends." And a publication otherwise libelous *per se* is excused only "when honestly made in belief of its truth and fairness and upon reasonable grounds for such belief, and consists of fair comments upon the conduct of any person in respect of public affairs made after a fair and impartial investigation." Rem. & Bal. Code, § 2425 (P. C. 135 § 345). It follows, therefore, that though the occasion of the publication here in question was one of privilege, the publication itself was not privileged, in that it charged a crime and imputed moral delinquency to a public officer. The appellant was, therefore, put to his defenses of justification and excuse, as accorded by the statute, in order to negative the presumption of malice raised by the publication. But each of these defenses includes the element of good faith, and only negatives the presumption of malice raised by the character of the publication. It further follows, therefore, that when evidence tending to establish these defenses was introduced the question of actual or express malice was still a question for the jury, and the burden of proving it beyond a reasonable doubt was upon the state. Since the nature of the publication was such

as to exceed the privilege of the occasion, the allegation in the information that it was malicious and willfully, unlawfully and maliciously composed, printed, and published, was sufficient to put in issue the good faith of the publication under another section of the statute. Subdivision 3, Rem. & Bal. Code, § 2303 (P. C. 135 § 101), defines the term malice as follows:

" 'Malice' and 'maliciously' shall import an evil intent, wish or design to vex, annoy or injure another person. Malice may be inferred from an act done in willful disregard of the rights of another, or an act wrongfully done without just cause or excuse, or an act or omission of duty betraying a willful disregard of social duty."

We find no merit in the further claim that the information was demurrable in that the publication was privileged on its face under Rem. & Bal. Code, § 2428 (P. C. 135 § 351), as a report of a judicial proceeding. That section provides:

"No prosecution for libel shall be maintained against a reporter, editor, proprietor, or publisher of a newspaper for the publication therein of a fair and true report of any judicial, legislative or other public and official proceeding, or of any statement, speech, argument or debate in the course of the same, without proving actual malice in making the report."

That section is practically identical with § 247 of the New York Penal Code of 1908, which was originally passed in 1854, and has been held simply declaratory of the common law. *Ackerman v. Jones*, 37 N. Y. Sup'r Ct. 42; *Edsall v. Brooks*, 17 Abb. Pr. (N. Y.) 221. At common law, privilege was confined strictly to a fair report of the actual proceedings in court without comment, color, construction or aspersion.

"There is not a dictum to be met with in the books, that a man, under the pretence of publishing the proceedings of a court of justice, may discolor and garble the proceedings by his own comments and constructions, so as to effect the purpose of aspersing the characters of those concerned."

*Thomas v. Croswell,* 7 Johns. (N. Y.) 264, 271, 5 Am. Dec. 269.

"It is an established principle upon which the privilege of publishing a report of any judicial proceeding is admitted to rest, that such report must be strictly confined to the actual proceedings in court, and must contain no defamatory observations or comments from any quarter whatever, in addition to what forms strictly and properly the legal proceedings." *Stanley v. Webb,* 4 Sanford (N. Y. Sup'r Ct.) 21.

The same is true under the statute. *Edsall v. Brooks, supra.* The purpose of the article on its face was not to report the proceedings but to criticise the officer. *Ludwig v. Cramer,* 53 Wis. 193, 10 N. W. 81. The very headline negatives the claim of privilege. *Dorr v. United States,* 195 U. S. 138; *Hayes v. Press Co.,* 127 Pa. St. 642, 18 Atl. 331, 14 Am. St. 874, 5 L. R. A. 643; *Edsall v. Brooks, supra.*

We hold that the publication here in question was libelous *per se.* It exceeded the privilege of the occasion. The information alleged express malice. The appellant was remitted to his statutory defenses of justification and excuse. If there was any evidence tending to prove either of these defenses, the state could only rebut it by proof of actual or express malice. If there was any evidence tending to establish either the defenses or the rebuttal, both those questions were for the jury. The demurrer was properly overruled.

III. During the course of the trial, the appellant offered evidence tending to show that, prior to the publication of the article in question, he had investigated certain cases and transactions with which the complaining witness had been connected in a personal or professional capacity, with some of them as prosecuting attorney, and with some in his private practice as an attorney. He offered to detail the steps taken and the result of these investigations, and to testify to the effect that he was thereby convinced of the personal dishonesty and of the professional and official misconduct of the complaining witness. These matters were wholly unre-

lated to the Fulcher case. They were excluded. It is claimed that they were admissible, (a) as showing the appellant's grounds for a lack of confidence in the complaining witness and as inducing the appellant's investigation of his conduct in connection with the Fulcher matter; and (b) as supporting a general charge of misconduct which it is claimed was made by the first sentence of the offending article.

(a) The evidence offered, in so far as it referred to matters not mentioned in the libelous article, was clearly inadmissible. It had no relevancy to the main issue, namely, the malice or absence thereof in the admitted publication, nor to the subsidiary issues of justification by proof of the truth of the things charged, and excuse by proof of the honesty of the charge and a belief in its truth based upon a fair and impartial investigation. It is manifest that an investigation creating a belief of other delinquencies would have no tendency to promote an *impartial* investigation of the specific thing charged. If it affected the result at all, its natural tendency would be to create a prejudice inimical to a fair and impartial investigation. It is equally manifest that such evidence would tend to create a prejudice in the minds of the jurymen inimical to a fair consideration of the truth and good faith of the publication, which was the only matter submitted to their decision.

"Of all rules of evidence, the most universal and most obvious is this, that the evidence adduced should be alike directed and confined to matters which are in dispute, or which form the subject of investigation. The theoretical propriety of this rule never can be a matter of doubt, whatever difficulties may arise in its application. The tribunal is created to determine matters, which either are in dispute between contending parties or otherwise require proof; and anything which is neither directly nor indirectly relevant to those matters ought at once to be put aside, as beyond the jurisdiction of the tribunal and as tending to distract its attention and to waste its time." Jones, Evidence (2d ed.), § 135, p. 151; 8 Ency. Evidence, p. 229.

In *Bourreseau v. Detroit Evening Journal Co.*, 63 Mich. 425, 437, 30 N. W. 376, Campbell, C. J., speaking for the majority of the court, affirming the action of the trial court in excluding testimony much more nearly related to the things charged in the libelous article than the evidence offered here, said:

"But this testimony, even if in a proper form, was not admissible. It has been decided by our own authorities, and we have no occasion to look further. The practice is settled in this state, as at common law, that it is not competent to prove distinct facts in defense that have not been made part of the issue as framed. No one can be prepared in advance to anticipate every fact, true or false, which may be offered in evidence, and of which he has had no notice. If this charge had been made in the libel, plaintiff could have had an opportunity to meet it, and also to make inquiry into the character and veracity of the witnesses. It is not pretended that defendant, or the author of the libel, had ever heard of it, and relied upon it when the libel was written. There is no principle which will permit such extraneous specific charges to be gone into for any purpose. *Proctor v. Houghtaling*, 37 Mich. 41; *Fowler v. Gilbert*, 38 Id. 292. A general justification requires the statements to be proved as alleged in the libel, and not otherwise. *Bailey v. Kalamazoo Pub. Co.*, 40 Mich. 251."

(b) The second contention as to the admissibility of this testimony is based upon an assumption not sustained either by the publication itself or by the information. It is claimed that the first sentence of the article was a general charge of official misconduct. The information does not charge it, standing alone, as libelous. Clearly it was not so intended and, when read in context, cannot be so construed. The headline of the article, "Why does prosecutor defend a rapist?" immediately precedes the sentence in question, which is followed by a specific charge that the action of the prosecutor in the case of "Walter Fulcher, self-confessed rapist, is bringing many to believe that Bixby must have some personal motive in extending his protection to that scoundrel." As

the article proceeds, every incident mentioned is in some man-
ner, either directly or by implication, made to have a sinis-
ter bearing on the Fulcher case. The opening sentence of
the article, expressing a wonder of many people if they are
not misplacing their confidence, is clearly intended as a
mere introduction to the specific charge thereafter set out
as the basis of the wonder so exposed. On no sound theory
could the court have admitted the evidence offered, save as
to the matters specifically referred to in the publication itself,
or directly connected therewith. *Bourreseau v. Detroit
Evening Journal Co., supra; Fountain v. West,* 23 Iowa 9;
*State v. Lomack,* 130 Iowa 79, 106 N. W. 386; *Smith v.
Hubbell,* 151 Mich. 59, 114 N. W. 865.

The court refused to permit the appellant to relate to the
jury the story told to him by a woman who claimed that the
prosecuting witness had wronged her and her aged mother
in disposing of an estate of one of his clients, an incident re-
ferred to in the offending article, and referred to in the rec-
ord as the Kennedy will case. The court intimated that, if
competent evidence of the truth of the story were offered, he
would admit it, and, also, evidence of whatever investigation
the appellant had made as to its truth. The story itself
would obviously be but an elaboration of the charge made in
the publication on hearsay, and of which in the article itself
the appellant mildly disclaims a belief. A repetition of the
story on the witness stand would not tend to justify its pub-
lication. It would still be hearsay. Its publication could
only be justified, if at all, by proof of its truth. It could not
be excused by proof of reasonable grounds for belief based
upon investigation, since it did not relate to "the conduct of
any person in respect of public affairs."

It is also claimed that the court erred in sustaining the
state's objections to cross-examination of the prosecuting
witness touching his connection with the Kennedy will case.
This was not error. The truth of the publication in relation
to that case was a matter of defense. If the appellant de-

sired to prove its truth by the prosecuting witness, it was his privilege to call him as a witness for the defense.

IV. The claims of error in overruling the appellant's motions for an instructed verdict of not guilty at the close of the state's evidence, and again at the close of all the evidence, are untenable. The state made a *prima facie* case by the appellant's admission of the publication of the article, his admission of the general circulation of the paper in Whatcom and adjoining counties, and the admission of the appellant's connection with the paper as manager. The article was, as we have seen, libelous *per se*. It passed beyond any occasion of privilege. These admissions, with the presumption of malice resulting from the tendency of the article itself, were sufficient to have sustained a verdict of guilty. *Bourreseau v. Detroit Evening Journal Co., supra; Holmes v. Clisby,* 121 Ga. 241, 48 S. E. 934, 104 Am. St. 103, 108; *Quinn v. Review Pub. Co.,* 55 Wash. 69, 104 Pac. 181, 133 Am. St. 1016. Moreover, at the close of the state's case in chief, evidence had been introduced tending to prove express malice. The complaining witness and another man had testified that, in an altercation between the complaining witness and the appellant which occurred a short time before the publication of the article here in question, the appellant had said: "Damn you, you have been fair haven't you; I will show you up yet;" and, "I will get you yet." We express no opinion as to the weight of this evidence. That was a question for the jury. We hold, however, that it was some evidence of malice; and if the proof of express malice had been upon the state in the first instance, it would have been sufficient to carry the case to the jury upon that question.

At the close of all the evidence, the situation was practically unchanged, further than that a conflict had been raised by the appellant's denial of the use of the words attributed to him by the state as showing malice, and that he

had introduced evidence tending to establish the truth of most
of the things charged in the publication. The state in turn
had introduced evidence tending to rebut this testimony. In
view of the fact that this case must be tried again, it is not
our purpose, nor would it be proper, to discuss the evidence
in detail, further than is necessary in connection with cer-
tain erroneous instructions hereafter to be noticed. It must
suffice to say that we have carefully read the appellant's ab-
stract of record, with frequent references to the lengthy
statement of facts, and we are satisfied that there was evi-
dence sufficient to take the case to the jury upon every issue
presented.

V. As tending to prove the truth of the charge con-
veyed by the article in question, that the prosecuting witness
had refused to prosecute Fulcher, in violation of his official
duty, claiming that there was insufficient evidence to cor-
roborate the story of the wronged girl as to Fulcher's com-
mission of the crime, the appellant testified to his own in-
vestigations as to such corroborating evidence. It was
shown that the girl was an orphan who had been in charge
of the Washington Childrens' Home Society at Seattle, and
when about nine years old had been adopted by a man and
wife named Hendrickson, who lived in Whatcom county, and
had lived with them until a few months before the commis-
sion of the crime. Fulcher, who at the time lived at Lynden,
Washington, had peculiar religious beliefs, and sometimes
preached, or lectured. He prevailed upon the Hendricksons
to finance the establishment of a mission in the city of Bel-
lingham, at which he, Fulcher, would conduct meetings.
When the mission had been established, Fulcher for some
time roomed at the Hendricksons.

The evidence tended to show that, during his stay in the
Hendrickson home, he acquired great personal influence over
the girl, Gertrude Hoff, who was then between fourteen and
fifteen years of age. Both Hendrickson and his wife testified
that Fulcher's influence over the girl became so apparent

that they feared for the girl's safety. Mrs. Hendrickson testified that on one occasion, apparently some three or four months before the commission of the crime and while Fulcher was an inmate of the Hendrickson home, she discovered Fulcher and the girl in the bathroom with the door locked. Mr. Hendrickson testified that, on another occasion, when he was in an adjoining room, he heard voices in his own bedroom and, on entering, found the girl making the bed and Fulcher reading the Bible to her. Finally, the Hendricksons, in order to remove the girl from Fulcher's influence, sent her to live with a family named Lamach. Fulcher having returned to his home at Lynden frequently telephoned to the girl at Lamach's, and wrote her letters, in at least one of which he sought to wean her away from the Hendricksons; and expressed the intention, as soon as he had sufficient funds, to bring her to Lynden to live with himself and wife. The situation was finally reported to the officers of the Childrens' Home Society at Seattle and, on their suggestion, the Hendricksons relinquished their right to the custody of the girl by reason of their adoption. The girl was then taken to Seattle, and shortly afterwards was placed by the officers of the society in charge of her aunt in Tacoma.

A short time afterwards, Fulcher sent his wife to Tacoma to bring the girl to their home in Lynden. Mrs. Fulcher brought the girl to Nooksack. From there she telephoned to one Rusco in Lynden to come to Nooksack for her and the girl with an automobile, but to say nothing about the matter, and to come at such a time as to enable them to reach Lynden after dark. Rusco, meeting Fulcher on the street, mentioned the matter, and Fulcher stated that he was expecting his wife and the girl, and accompanied Rusco to Nooksack, returning with his wife and the girl to Fulcher's home about half past nine in the evening. The girl remained in the Fulcher home for a few weeks, when the officers of the Childrens' Home Society learned of her presence there and applied to Bixby, as prosecuting attorney of Whatcom

county, for assistance in recovering her. On his advice, they secured the aid of the town marshal of Lynden, who, with a representative of the Childrens' Home Society, secured the girl, who was then taken to the childrens' home in Seattle. Two weeks thereafter she divulged the fact that Fulcher had committed a crime upon her, with the connivance and through the persuasion of his wife. It is not necessary to state the revolting details of her story. The evidence tended to show that the prosecuting witness, by reasonable investigation, could have ascertained the truth of all of these facts, most of which were reported to him by the girl herself, and by persons connected with the Childrens' Home Society. He admitted that he did not interview the Hendricksons nor the Lamachs in his quest for evidence. He testified that the reason he did not prosecute Fulcher was because he believed that, under a recent decision of this court, there was not evidence sufficient to corroborate the testimony of the girl connecting Fulcher with the commission of the crime, as was then required by the statute of this state. Rem. & Bal. Code, § 2443 (P. C. 135 § 381).

The case referred to was *State v. Gibson*, 64 Wash. 131, 116 Pac. 872. He testified that, up to the time of that decision, it was his understanding that opportunity, together with intimate acquaintance, would be sufficient corroboration. He testified to the effect that he construed that decision as laying down a new and drastic rule of corroboration, making a conviction very difficult. It is thus apparent that this question of the sufficiency of the evidence, which the prosecuting witness might have secured in corroboration of the girl's story, was a vital question in the case, going to the good faith of the appellant in publishing the article, on the one hand, and to the good faith of the prosecuting witness in refusing to prosecute Fulcher, on the other. The court, after instructing the jury that the statute provides that no conviction shall be had for rape upon the testimony of the female against whom the crime was committed, unless sup-

ported by other evidence, and that such corroboration may consist of circumstantial evidence, further instructed as follows:

"You are instructed that some testimony has been introduced in this case with reference to the acquaintanceship and relations of Gertrude Hoff and Walter Fulcher while she was living at the home of Henry Hendrickson in Bellingham, Washington, and at the home of one John Lemach, in Bellingham, Washington. One feature of this testimony relates to an incident which one witness testified occurred in the bathroom at the home of said Hendrickson, in which room it was stated said Gertrude Hoff and Walter Fulcher were on one occasion when the door was locked. If the said Gertrude Hoff would testify that on that occasion there were no improper relations between her and the said Walter Fulcher, and that this incident occurred several months prior to the date on which the said Gertrude Hoff charges that the crime of the said Walter Fulcher was committed upon her, you are instructed in this connection that said bathroom incident as a matter of law under the decisions of this state would not have constituted corroborative evidence that the crime was committed by the said Walter Fulcher; and the said Frank W. Bixby as prosecuting attorney of Whatcom county, Washington, could not as a matter of law have regarded or taken the said bathroom incident as corroborative evidence of the fact that said crime had been committed by the said Walter Fulcher."

This instruction was clearly erroneous, in that it mentioned a single incident in a chain of circumstances all having a clear corroborative tendency connecting Fulcher with the commission of the crime, and instructed to the effect that it had no corroborative force. From this instruction the jury might have implied that the other circumstances in evidence were immaterial. The court in giving this instruction was probably influenced by the decision in the case of *State v. McCool*, 53 Wash. 486, 102 Pac. 422, 132 Am. St. 1089, in which a somewhat similar incident, though from its nature much less unusual and suspicious than that presented by the bathroom incident in this case, was held not to constitute

sufficient corroboration to sustain a conviction, because of
the fact that it occurred some two months previous to the
time charged by the injured girl in that case as the time of
the crime.   In that case, however, the incident was appar-
ently the only corroborative circumstance.   That case went
to the extreme limit.   But even so, the circumstance here
involved possessed much greater probative force than the
incident there presented.   The fact that this man and this
young girl were together in the bathroom with the door
locked was a circumstance so unusual in its nature, and so
violative of the proprieties, as to constitute corroborative
evidence by its tendency to show an undue intimacy between
the parties likely to culminate in the crime in question.
Standing alone it might, under the rule in the McCool case,
be held insufficient corroboration.   But when taken in con-
nection with the other circumstances in evidence, it clearly
possessed strong corroborative force.

The court also instructed the jury as follows:

"You are instructed that if you find from the evidence in
this case, that on or about the month of August, 1911, at the
time or times that the alleged crime of Walter Fulcher, to wit,
the crime of rape upon the person of Gertrude Hoff, was
brought to the attention of Frank W. Bixby as prosecuting
attorney of Whatcom county, Washington, the only facts
showing or tending to show the commission of such crime
consisted of the statement of Gertrude Hoff that Walter
Fulcher had committed the crime referred to, at the time,
place, manner and circumstances under which such crime was
committed and that other witnesses were available to prove
that opportunity existed for the commission of said crime
by the said Walter Fulcher and others, and that certain
physicians would be able to testify from a physical examina-
tion of said Gertrude Hoff made some two weeks after said
Gertrude Hoff had left the said Walter Fulcher, that some
one had held sexual intercourse with her, then the court in-
structs you as a matter of law there was not such corrob-
orating evidence to convict the said Walter Fulcher of the
crime of rape under a plea of not guilty without some ad-
ditional fact or facts in a material matter which tended to

connect the said Walter Fulcher with the commission of the offense."

This instruction was also clearly erroneous, in that it carried the inference that no evidence could have been procured by the prosecuting attorney tending to corroborate the girl's story, except the statement of the girl herself, opportunity to commit the crime, and the fact that the crime had been committed by some one, as disclosed by the physicians' examination. The record not only ᶜdiscloses these facts, but also the many other facts which we have pointed out, all of which constituted a chain of corroborative circumstances. It was error to single out the mere circumstances of opportunity, and the girl's subsequent condition, as the only corroborative circumstances. This last mentioned instruction seems to be based upon the theory of the prosecuting witness as to the bearing of the case of *State v. Gibson, supra,* concerning which he was permitted to testify, placing before the jury his own construction of that decision. That case, however, contrary to his statement, announced no new rule. It quoted from *State v. Jonas,* 48 Wash. 133, 92 Pac. 899, decided in December, 1907, the following language, which was the whole of what the witness, in effect, told the jury was the new and drastic rule announced in the *Gibson* case:

"It has often been held that mere proof of acquaintance and opportunity will not satisfy the requirements of such a law." (See *State v. Jonas,* 48 Wash. 134.)

In the *Gibson* case, the actual facts with reference to which the quotation was applied are all set out in the opinion. They show intimate acquaintance, but only a scintilla of proof of opportunity, and that scintilla was denied by the girl's father and sister. There was not a word of testimony from any source, save the girl herself, that she and the accused were ever alone together. Practically all of the facts are recited in the opinion, and show that the real opportunity lay with another young man, who had lived in the

same house with the girl for two years covering the period when in the nature of things the crime must have been committed, and slept in an adjoining room ,with nothing but a curtain between that and the room occupied by the girl. It further appeared that the girl at first accused this other young man, who practically admitted the act, desired to marry the girl, and fled the country when her condition became known. His whereabouts were unknown at the time of the trial. The wide difference between that case and this seems too plain to require comment.

The prosecuting witness further testified that he submitted to one of the judges of the superior court of Whatcom county a hypothetical case, and was advised that there was not sufficient corroboration to justify a prosecution. The evidence also shows that, on inquiry from the attorney general, to whom complaint had been made of the failure to prosecute, he submitted the facts to the attorney general, who also advised him that there was not sufficient corroboration. He admitted, however, that, both in his hypothetical case submitted to the judge and in the facts submitted to the attorney general, he confined his statement of the corroborative evidence to the facts of acquaintance, opportunity, and the statement of physicians that the physical condition of the girl showed that some one had committed the offense. In view of the fact that the prosecuting witness was permitted to lay before the jury in his testimony his construction of the *Gibson* case, with the inference that one of the superior court judges and the attorney general entertained the same view as to the law of corroboration, it was incumbent upon the court, either to have instructed generally as to the law of corroboration, and then advised the jury that if they found from the evidence that there was sufficient corroboration to have connected Fulcher with the commission of the crime, such evidence should be considered as tending to justify or excuse the publication of the article, if the jury further found from the evidence that the appellant as manager of a

newspaper had upon investigation discovered those facts; or on the other hand, if the court desired, in addition to the general charge, to mention any of the circumstances offered as corroborative evidence, he should have enumerated all of the circumstances, including the bathroom incident, the bedroom incident, Fulcher's pursuit of the girl by telephone messages and letters, and above all, the vital circumstance that he sent his wife to Tacoma to bring the girl to his home, and the circumstances indicating a desire for secrecy. He should then have left it to the jury to say whether these things connected Fulcher with the crime.

It is true, as the court instructed, that corroboration may consist in circumstantial evidence. All of the circumstances surrounding Fulcher and the girl, from their first acquaintance until the girl's ruin, tended strongly to corroborate the girl's story, not only that Fulcher committed the crime, but that his wife aided and abetted therein. We know of no case, and none has been cited, in which such a chain of circumstances has been held not to constitute corroborative evidence. Certainly there is no decision of this court so holding. The giving of these instructions was error necessitating a reversal.

VI. What we have said touching the evidence, and our discussion of the law of the case touching the sufficiency of the information, makes it unnecessary to review the other assignments of error, or the other instructions, save one. It reads as follows: .

"I instruct you that if you find that the following language, 'Is it true, as is charged by a woman who claims that Bixby wronged her aged mother, and herself in the matter of disposing of an estate of one of Bixby's clients, that Walter Fulcher knows too much about Bixby,' when used in connection with the balance of the published article, refers to the said Frank W. Bixby as a private citizen, or an attorney at law, and that the same tends to expose the said Frank W. Bixby as such private citizen, or an attorney at law, to hatred, contempt or obloquy, or to deprive him of the benefit

of public confidence, or social intercourse; that the defendant was not privileged to publish such language under the law of privilege as heretofore defined to you, and the publication of such language is by the law deemed malicious, and the defendant cannot excuse such publication, as I have heretofore defined excuse to you, and the burden is upon the defendant to show that he published the same without malice."

It is first contended that this instruction was erroneous in that it authorized the jury to consider a part of the publication separate and apart from the other portions. It is not capable of that construction. Its clear import was that, in determining the tendency of the language quoted from the article as injuriously affecting Frank W. Bixby in his private capacity, it must be construed in connection with the balance of the published article.

It is next claimed that this instruction was erroneous in that it deprived the appellant of the benefit of his privilege under the statute. What we have said in discussing the sufficiency of the information disposes of this claim. The privilege consists of a fair discussion of a person's conduct in respect of public affairs. Reflections upon his acts as a private citizen are not within the privilege. If, therefore, this language, taken in connection with the balance of the article, was calculated to expose the prosecuting witness as a private citizen to obloquy, etc., a thing which was left to the jury to determine, then, as a matter of law, it exceeded the privilege of the occasion.

It is also urged that the court by this instruction pronounced the publication of this incident malicious, thus taking the question of malice from the jury. The court, however, did no more than to announce the rule declared by the statute. If the language exceeded the privilege and had the tendency mentioned, malice would be presumed. The statute so declares. If the jury found the tendency, then the burden of proving that the aspersions against Bixby as a private citizen and as an attorney were made without malice, was shifted to the appellant. It is true that malice is always a

question for the jury under proper instructions. It may be inferred, however, from the tendency of the article, as well as from evidence showing express malice. The statute can have no other meaning.

The fact that in the article itself the appellant disclaims knowledge of the facts, and refuses to subscribe to the accuracy of the woman's charge, and declares that they are so serious as to be difficult of belief, was no excuse for the publication. On the contrary, that should have been a reason for withholding the story until the facts were ascertained to be true. *Brewer v. Chase*, 121 Mich. 526, 80 N. W. 575, 80 Am. St. 527, 46 L. R. A. 397; *Edwards v. San Jose Printing & Pub. Soc.*, 99 Cal. 431, 34 Pac. 128, 37 Am. St. 70; *State v. Ford*, 82 Minn. 452, 85 N. W. 217. We find no error in this instruction.

For the error in the instructions touching corroboration, the judgment is reversed, and the cause is remanded for a new trial.

CROW, C. J., MAIN, and GOSE, JJ., concur.

CHADWICK, J., concurs in the result.