[No. 41518.    En Banc.    March 25, 1971.]

THE STATE OF WASHINGTON, *on the Relation of Charles O. Carroll, Petitioner,* v. JOHN M. JUNKER *et al., Respondents,* HERBERT I. LAKEFISH, *Petitioner.**

*Charles O. Carroll, Prosecuting Attorney, William L. Kinzel, Deputy,* and *Herbert I. Lakefish,* for petitioners.

*Slade Gorton, Attorney General,* and *James B. Wilson, Assistant,* for respondents.

*Ronald J. Perey, Landon R. Estep,* and *Edmund J. Wood,* amici curiae.

HALE, J.—A law teacher and two of his students, conducting a class research project, were permitted by superior court order to examine 189 randomly selected mental illness files. Citing RCW 71.02.250, relating to mental illness cases, the prosecuting attorney and others challenge this order as a breach of confidentiality.

The statute reads:

*All files in these cases shall be closed files subject to examination only on court order:* Provided, however, That this shall not apply to duly authorized representatives of the department of institutions designated by the director insofar as it may be necessary for the department to examine data, other than medical reports, to determine financial responsibility for the expense of care and treatment of the patient. Where a person is found mentally ill the clerk shall cause the following facts to be noted in his probate docket: Name and age of such person, date of order of hospitalization, place of hospitalization, date of parole and date of discharge. Where a person is found not to be mentally ill the clerk shall cause such proceedings to be noted in an alphabetically arranged index, which index shall contain the following information: Name of person filed against, date of order dismissing proceedings, and probate cause

number. This index shall be open to inspection only under court order. Nothing in this section shall be construed to prevent the forwarding of all case histories, physicians' reports, and other case data to the state hospital or other agency in which a mentally ill person may have been ordered hospitalized.

(Italics ours.) RCW 71.02.250. Complementing this statute, another section provides for closed mental illness hearings unless an open hearing is demanded or there is to be a jury trial. RCW 71.02.160. These statutes, affording as they do a statutory right to privacy, represent a diametric departure from the general rule that court records and files are public records, open to public inspection at reasonable times and places.

John M. Junker, Associate Professor of Law, University of Washington Law School, as a regular part of the law school curriculum, taught a 6-hour course, Law 614, described as a seminar in criminal procedure. After preliminary conversation on the subject, Professor Junker, October 29, 1969, wrote to Judge Solie M. Ringold, Chairman of the King County Superior Court's Domestic Relations and Family Court Committee, requesting authority from that committee for two of his students to examine the closed mental illness files, observe mental illness commitment proceedings and interview personnel officially concerned with such proceedings. Mentioning the confidentiality of these files, the letter acknowledged that such authorization "be conditioned upon guarantees of anonymity." It named Mr. Joe Burnstin, a third-year law student, and Mrs. Virginia McBroom, a graduate student in sociology, as the students for whom the permission was sought.

Judge Ringold replied by letter on November 5, 1969, to Professor Junker, stating that the Domestic Relations and Family Court Committee had granted the request and would permit Mr. Burnstin and Mrs. McBroom to observe mental illness commitment proceedings, conduct staff interviews and examine the court's files. The letter said that

a court order would be required designating the specific files to be opened, that "anonymity of the parties involved will be maintained at all times" and that "We are all aware of the necessity for confidentiality."

Professor Junker, November 26, 1969, in a cause entitled "In re One Hundred Eighty-Nine Randomly Selected Case Files," presented ex parte to Judge Ringold a combined motion and order which listed by number 189 superior court mental illness cases, selected at random, beginning with number 37,000 and increasing irregularly to number 37,747. The motion-order recited that the 189 listed files represented a random sampling of 25 per cent of the mental illness cases filed in King County Superior Court between October 1, 1968, and September 30, 1969. It declared that, among the objectives of the project, Mr. Burnstin and Mrs. McBroom were to collect data showing the relationship between the applicant for and the subject of the involuntary mental illness proceedings; the patient's age, sex, race, and marital status; the "relationship between the applicant's allegations of mental illness and the diagnosis, or lack thereof, of mental disorder;" and the nature of the mental illness for which involuntary hospitalization was sought. Directing that Joseph Burnstin and Virginia McBroom be permitted, under the general supervision of Professor Junker, to examine the enumerated 189 files, the order declared that confidentiality of the files be maintained and that the anonymity of any person identified in them be preserved. On presentment, it was signed and entered by Judge Ringold November 26, 1969.

These files, it should be noted, represented current court business between October 1, 1968 and September 30, 1969, concerning persons alleged to be mentally ill. The motion-order does not indicate on its face who actually presented it to the court, but the motion segment bears the signature of Professor Junker. No file number appears on the order except that beneath the judge's signature is the notation "See file 37000 for original signature" which number is the first of the 189 cases listed. Handwritten

in large numbers on the upper right segment where the file number is usually placed is the number 37,700, this number being 180th in the list of 189 files. Presumably, this was a means of filing a copy of the order in each of the 189 files. The only notice of presentment of the order—so far as the record reveals—was the letter to and conversation with Judge Ringold. Its entry, therefore, must be deemed ex parte and without notice.

With the entry of the order on November 26, 1969, respondents Burnstin and McBroom began to examine and continued during the remainder of November and through December and January to open and read the 189 listed files and to record their observations in writing and by tape recorder. Each of these 189 files purports to contain significant data and information about the individual who is the subject of the mental illness application, including psychiatric and medical observations, military records, a record of mental illness in the family, marital history, use of alcohol and drugs, previous physical and mental illnesses and surgery, earlier commitments and references to suicidal, homicidal, criminal and antisocial behavior. Usually there is some information in these files as to the financial position of both the patient and members of his family.

Things went along quietly under the aegis of the order during the weeks that the files were opened and examined. Then the litigation began, and the ex parte order of November 26, 1969, proliferated. The King County Prosecuting Attorney, alleging that the 189 persons whose files had been opened had suffered an unwarranted breach of privacy, started things moving on February 4, 1970, by demanding a temporary and a permanent injunction to prevent Professor Junker, Mr. Burnstin and Mrs. McBroom from revealing, using, disseminating or communicating any of the information obtained from the 189 files. The complaint asked that all notes, memoranda and tapes made during the inspection be destroyed unless the individual subjects of the mental illness files, or their legal representatives, would consent in writing to their continued

possession and use by the two students and Professor Junker.

Judge Stanley C. Soderland of the superior court heard the first phase February 4, 1970, and issued that day a temporary restraining order and order to show cause which directed that, pending further hearings, no disclosures or revelations be made from the files. February 16, 1970, Herbert I. Lakefish filed a complaint in intervention saying that he had been appointed and served as guardian ad litem in mental illness cases numbers 37,256, 37,674, 37,715, 37,650 and 37,669, among those listed and, as an erstwhile guardian ad litem, had a justiciable interest in maintaining the confidentiality of the files. He requested that there be a permanent injunction against further use or disclosure of their contents. March 4, 1970, another judge, Judge Frank H. Roberts, directed that Mr. Lakefish be allowed to intervene on behalf of the individual parties represented by the listed numbers "and on behalf of other guardians ad litem similarly situated."

In the meanwhile, the University of Washington Board of Regents, February 20, 1970, filed its complaint in intervention stating that Professor Junker's project was one of many research activities carried on by the University and expressed confidence that the two students would respect the rule of confidentiality as assured by the court order. It stated further that the University would suffer irreparable harm if the research were halted. March 5, 1970, relator prosecuting attorney and intervenor Lakefish filed a "Motion to Vacate Order In re One Hundred Eighty-Nine Randomly Selected Case Files" of November 26, 1969. On the same day, Professor Junker and his two students moved to dismiss relator's complaint for injunction. The motion to vacate came on before a different department, Judge Ward Roney, who, March 5, 1970, entered an order continuing in force the earlier temporary injunction and directed that the cause be transferred to Judge Ringold for reconsideration of the initial ex parte order of November 26, 1969. March 6, 1970, Judge Ringold ordered that

the Board of Regents be allowed to intervene. The American Civil Liberties Union thereafter entered the case on appeal to take both sides, filing a brief amicus curiae which supports affirmance and reversal.

Thus, events came full circle and the main issues now came on for hearing before the very court which had originally issued the first ex parte order of November 26, 1969, except that what had earlier been ex parte had by then become militantly adversary. Judge Ringold heard both the researchers' motion to dismiss the complaint and relator's motion to vacate the original order. Counsel for relator, however, stated for the record that he did not know that the court was to hear both motions; he said that relator intended to argue only his motion to vacate the first order and not the researchers' motion to dismiss relator's complaint.

Relator objected to that particular judge passing on the researchers' motion to dismiss the relator's complaint because that motion, he said, went beyond the question of the court's initial discretion and into the merits of the cause. Relator contended that his motion to vacate the order of November 26, 1969, raised the issue of whether the court had abused its discretion in entering the order of November 26, 1969. The Board of Regents' and the researchers' motion to dismiss relator's complaint, he urged, evoked the larger and ultimate issues of whether, without notice to the parties or to someone designated to represent them, the 189 files should be opened. Relator argued that the research going on was no more than a classroom project and did not constitute a research project by the University of Washington.

Raising another point, relator and intervenor Lakefish suggested that Judge Ringold ought not hear intervenor Board of Regents' motion to dismiss relator's complaint for injunction because that motion was supported by an affidavit signed by Judge Ringold. Deeming the issues to be largely coextensive, the court, despite the objections, heard both motions. In written orders dated March 9, 1970,

it denied relator's motion to vacate the order of November 26, 1969, and granted intervenor's motion to dismiss relator's complaint for injunction. Relator and intervenor Lakefish now seek review of the two orders.

The question raised as to the judge's affidavit should be considered first. Although relator's motion to dismiss, dated February 18, 1970, and filed February 20, 1970, was apparently presented by counsel for intervenor Board of Regents, it recites that it was made by respondents Junker, Burnstin and McBroom. The motion states that it is based on the files and attached affidavits, among which, as noted, was the affidavit of Judge Solie M. Ringold, dated and served upon relator and intervenor Lakefish February 20, 1970. That affidavit, running to three double-spaced, legal-sized pages, stated that Judge Ringold was chairman and named two other judges as members of the Domestic Relations and Family Court Committee of the King County Superior Court. It said that, in a mental illness case, one of the King County judges had ruled that a guardian ad litem must be appointed in all involuntary mental illness applications; that the committee had recommended, and the superior court judges had unanimously adopted, that ruling as an official policy; and that, after November 20, 1969, guardians ad litem would be routinely appointed by the court. The affidavit said that on October 23, 1969, a court commissioner had advised the committee that "The problem of miscellaneous students and observers at the mental illness hearings is still with us," and had requested a ruling from the judges on that matter.

The affidavit said that Judge Ringold's committee had given consideration to the appointment of counsel for persons not otherwise represented, and referred to a ruling by one of the judges who had decided that such appointments must be made in a mental illness case and that the judges of the superior court had unanimously declared it a policy that legally trained guardians ad litem be appointed for all unrepresented individuals subject to mental illness proceedings. Judge Ringold's affidavit stated that

the superior court committee had thereupon placed upon a superior court commissioner a duty to see that guardians ad litem were routinely appointed. The affidavit said that, in considering Professor Junker's request, Judge Ringold and the other two judges on the committee unanimously agreed that the "policy of the Committee would permit interviews of intake and court personnel and viewing of files if it served a valid research and educational purpose, and providing confidentiality were maintained." Apparently in answer to other affidavits, Judge Ringold's affidavit also stated that the court has designated persons other than the prosecuting attorney such as employees of the court to screen mental illness applications. Thus, the affidavit set forth more than purely formal or perfunctory matters of fact. Setting forth, as it did, the conclusions of other judges, the affidavit implied that the order of November 26, 1969, granting permission was a part of a judicially approved plan to open up the mental illness cases to public view and was partly related in some way with concepts of due process of law. The order dismissing relator's complaint signed by Judge Ringold March 9, 1970, listed this affidavit as the 11th among 16 enumerated items in reciting the evidence considered by the court in reaching a decision. We think it error for the court to have considered and passed upon a motion supported by an affidavit of the court which set forth substantive matters of fact and argument.

■■ Only in the rarest of circumstances should a judge be called upon to give evidence as to matters upon which he has acted in a judicial capacity, and these occasions, we think, should be limited to instances in which there is no other reasonably available way to prove the facts sought to be established. A record of trial or a judicial hearing speaks for itself as of the time it was made. It should reflect, as near as may be, exactly what was said and done at the trial or hearing. Except when ruling upon the admissibility of evidence, or on motions, or in making findings and conclusions, or in rendering oral or written mem-

oranda of decisions, a judge need not supply for the record an analysis of the mental processes by which he reached a conclusion either of fact or law. Aside from matters taken under judicial notice or formal matters omitted through inadvertence or oversight and readily available to all parties, the record for review must be accepted as it was made, as of the time it was made.

Judge Ringold's affidavit was filed February 20, 1970, long after the commencement of relator's suit for injunction. It went far beyond purely formal matters to set forth the conclusions of two other judges supporting the exercise of discretion. It pointed out that Judge Ringold was chairman of a committee of judges directing and supervising superior court actions and setting policy in domestic relations and family court matters. In saying that the whole court had decided to provide counsel to serve as guardians ad litem for all unrepresented parties in mental illness cases, the affidavit suggested that the judges' decision to accomplish these things was in some way connected with and supported both the research and order of November 26, 1969, opening the files.

Relating back as it did to matters and events occurring prior to the November 26, 1969, order, the affidavit constituted substantial evidence and argument admitted and weighed by the court in support of the court's ruling upholding its discretion in issuing that order. A determination of whether that discretion had been soundly exercised ought not have been made by the same judge who executed the affidavit.

This amounts to no more than a sensible application of the rule that a judge is disqualified from hearing a cause if it appears that he will be called as a witness in it. *State v. Sefrit,* 82 Wash. 520, 144 P. 725 (1914). If the cause is actually on trial before him, the judge should not take the stand as a witness. *Maitland v. Zanga,* 14 Wash. 92, 44 P. 117 (1896). See, also, 46 Am. Jur. 2d *Judges* §§ 112-14 (1969). It was, therefore, error for the court to retain jurisdiction of the cause, and both motions should have

been transferred for hearing to another department of the court.

This brings us to the main issues: Does the entire record support the issuance without notice of the order of November 26, 1969? Assuming sufficient notice of one kind or another to persons having an interest in preserving the confidentiality contemplated by statute, did the order adequately preserve the statutory privilege? We are not concerned here with the steps which the superior court may take consistent with the statutory rights of privacy to assure that mental illness hearings do not deteriorate into Star Chamber trials. The protection of persons who may be subject to mental illness proceedings is not before us for the issues do not embrace such questions. This is not an examination into whether the King County Superior Court affords due process of law to persons charged with being mentally ill, for no one in the case has asserted that they do not. The ultimate question is whether the court, on the showing made and without notice, properly ordered the files opened to the research team.

Petitions or applications for involuntary hospitalization because of mental illness are heard by the superior court. RCW 71.02.090. Anyone subjected to such an application may demand a jury trial. RCW 71.02.210. Although the mental illness proceeding does involve a final determination which may deprive one of his liberty and subject him against his will to medical treatment, confinement or restriction in one degree or another, the law contemplates that the atmosphere and proceeding shall be clinical rather than penal in character. Persons suffering from a mental or emotional illness are to be treated with the same sympathy and compassion as are persons suffering from a physical sickness or infirmity.

Apparently the legislature—consistent with due process of law and avoidance of the Star Chamber—believed that one way to encourage a clinical approach, maintain a clinical atmosphere, and sublimate any penal aspects of mental illness, is to avoid making public spectacles of the mentally

ill and to close the files. There are other reasons, too, for directing that the files be closed, not the least of which is that witnesses, members of the family, and others interested in the proceeding may act and speak with candor and forthrightness under the statutory theory that in most instances the proceeding is undertaken for the good of the subject and with the intention of getting a sick person into a hospital where he may receive medical care, and that the benefits of confidentiality and privacy far outweigh the dangers of Star Chamberism.

■ Mental illness files thus are closed files under RCW 71.02.250, in effect since 1951. Laws of 1951, ch. 139, § 38, p. 353; cf. prior, Laws of 1949, ch. 198, § 13, p. 609. The legislature, in directing that the files be closed, has done so in general language—leaving their opening to the discretion of the court. Under this statute, all persons connected with the mental illness proceedings, including the putative patient, are assured by law of a high degree of privacy—one to be breached only when a judge of the superior court, in the exercise of a sound discretion, decides that opening the files will not harm or embarrass anyone connected with the case, or that an overriding benefit, private or public, will accrue to offset any likely detriment. Thus, one seeking the right of inspection is obliged to demonstrate a substantial private need or a measurable private or public benefit.

■ In some instances, with respect to an application to examine an individual file, the public benefit may be clearly apparent on an ex parte showing, or the persons who applied for the order of involuntary hospitalization or the putative patient, already privy to much of the contents, may demonstrate ex parte an individual need and a legitimate reason to open the files. In such cases, the discretion of the court may be soundly exercised on a brief but clear showing without formal notice to others involved in the case. Or, the court may at any time examine court files and records and take judicial notice of their contents. The propriety of each order would in a large measure de-

pend upon who asked for the disclosure and for what purpose.

The present situation, however, differs greatly from situations where an individual connected with a particular case—the patient, or a close relative, for example—wishes to see the file; nor is this a case of the superior court taking judicial notice of its own records and files. To the contrary, this situation involved a wholesale examination of a substantial percentage of current, and presumably active, mental illness files by strangers to all and privy to none of the records which they sought to examine.

No notice whatever was given to anyone who had a direct and viable interest in preserving the privacy of the 189 mental illness files. There were no safeguards set up to preserve anonymity and confidentiality except the self-serving representation of the movants and the terms of the order. The movants did not suggest nor did the court designate a master or referee responsible to the court to assure that individual privacy and confidentiality not only be kept by the researchers but maintained after their findings had been placed in the public domain. The order of November 26th granting an examination of the 189 current mental illness files was entered without any notice to anyone who conceivably would have any justiciable interest in keeping them closed. Except for the representation of anonymity and confidentiality made by the two students and their teacher and the court's order, there were no safeguards of privacy and confidentiality. Those persons who were parties to or privy to the 189 files would have no way of knowing either that the rights of confidentiality and anonymity granted them by statute had not been breached.

Although the statute directs that the closed files be opened only on court order, it does not specify the conditions necessary for or the kind of notice required for an order opening them; but the question of judicial discretion inevitably arises with the challenging of the order. In some cases, as we have observed, no notice would be necessary

for the soundness of discretion would be readily apparent in the reasons advanced by the persons seeking the permission. But when complete strangers seek authority to open 189 current and active mental illness files ordered by statute to be kept closed, it amounts to a massive disclosure of the very records which the legislature has ordered closed. The request to open these 189 files invoked the direct and overt exercise of the court's discretion, and more than a perfunctory showing of need, benefit and freedom from harm was necessary to support the disclosures.

If it is reasonably apparent that parties or their privies to closed court files would in good conscience object to the disclosure of their contents, notice of some kind is required —notice to someone who would officially take a position adversary to the disclosure. Where there is sought a mass disclosure, there should be appointed a master or referee or someone to act on behalf of the court to assure that all promises are kept and that anonymity and confidentiality will be maintained. The statutory right to privacy specially granted by this statute (RCW 71.02.250), even though it represents a diametric departure from the general rule that court records and files are public records and open to inspection at reasonable times and places, should be maintained unless sound and substantial reasons are shown for its abrogation.

Confidentiality and closure of some kinds of judicial files are not unknown. There are several areas of law in which public access to judicial proceedings and records has been curtailed on the theory that privacy and confidentiality clearly outweigh the dangers from closed judicial hearings and proceedings. These areas include hearings and records relating to divorce. adoptions and mental illness and may in some instances with the consent of the accused be applied in criminal cases involving sexual offenses. Depositions containing false, scandalous, libelous and defamatory matters if inadmissible at trial may be ordered closed to protect the good name of innocent persons. By rule of court, disciplinary hearings for members of the bar are closed to

the public. As long as adequate safeguards are available in each case to avert the dangers of the Star Chamber, these limitations appear to be constitutional. The right of the people to know what is going on in their courts in such cases is considered to be subordinate to the public and individual benefits of privacy.

■ Accordingly, the discretionary powers of the court are invoked by the statute (RCW 71.02.250) when one seeks to breach the privacy conferred by it. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *State ex rel. Clark v. Hogan,* 49 Wn.2d 457, 303 P.2d 290 (1956). Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *MacKay v. MacKay,* 55 Wn.2d 344, 347 P.2d 1062 (1959); *State ex rel. Nielsen v. Superior Court,* 7 Wn.2d 562, 110 P.2d 645, 115 P.2d 142 (1941).

Whether this discretion is based on untenable grounds, or is manifestly unreasonable, or is arbitrarily exercised, depends upon the comparative and compelling public or private interests of those affected by the order or decision and the comparative weight of the reasons for and against the decision one way or the other. Had the court denied the application to open the 189 files on the basis of the showing made by the applicants and their proposed modus operandi, there would, we think, have been no manifest abuse of discretion. All the reasons supporting the continued interests of the parties and those in privy with them in the continuing confidentiality, anonymity and privacy of the 189 files in such instance could not be said to have been overcome or outweighed by the declared interests of the professor and his two students, or those of the University of Washington in having them opened to examina-

tion. Conversely, upon the showing made and considering the complete want of notice to anyone who would be required as a matter of law to oppose the entry of such an order and to represent the parties and persons connected with the mental illness files, and the lack of safeguards offered except the self-serving declaration of the examiners to preserve confidentiality and anonymity, the order appears to have been unsupported by adequate reasons or tenable grounds of sufficient weight or merit to overcome the public and private interests in a legislatively assured confidentiality and privacy.

Accordingly, the cause is reversed and remanded with directions to make the temporary injunction permanent.

HAMILTON, C.J., HUNTER, McGOVERN, and STAFFORD, JJ., and DONWORTH, J. Pro Tem., concur.

WILLIAMS, J.† (dissenting)—I dissent. The question raised by this appeal is whether Judge Ringold abused his discretion in allowing Professor Junker, Mr. Burnstin, a third-year law student, and Mrs. McBroom, a graduate student in sociology, to examine 189 randomly selected mental illness files in the King County clerk's office.

The Domestic Relations and Family Court Committee of the King County Superior Court is established by local Rule 0.6, which provides that the department shall be under the direction and supervision of the committee which shall conduct the business of the department and set policy in conjunction therewith, including matters relating to involuntary hospitalization hearings. This committee, consisting of Judge Ringold and two other superior court judges, "unanimously agreed that the policy of the Committee would permit interviews . . . and viewing of files [in involuntary commitment proceedings] if it served a valid research and educational purpose, and providing confidentiality were maintained."

---

†Justice Williams is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

On November 26, 1969, Professor Junker presented a motion to Judge Ringold requesting access to 189 randomly selected involuntary commitment case files. The motion stated that among the research objectives was the collection of empirical data regarding:

1. The relationship (family, social, etc.) between the applicant for involuntary hospitalization and the alleged mentally ill persons.

2. The age, race, sex, marital status and other characteristics of alleged mentally ill persons.

3. The relationship between the applicant's allegations of mental illness and the diagnosis, or lack thereof, of mental disorder.

4. The character of mental disorders diagnosed in those persons for whom involuntary hospitalization is ordered.

The motion further stated that it was essential to the achievement of these objectives that a random sample of cases be examined. The motion was granted and resulted in an order signed by Judge Ringold which provided that the inspection and examination of such files would be conducted in the King County clerk's office, and it contained this proviso:

[T]he confidentiality of such files shall be strictly maintained by such persons and that any report of the research will preserve the anonymity of any person, whether an alleged mentally ill person, witness or otherwise, who may be identified in such files; . . .

During the month of December, 1969, and the first week of January, 1970, Mr. Burnstin and Mrs. McBroom examined such files and made written and tape recorded notes of their contents. From December, 1969, through March, 1970, Mr. Burnstin and Mrs. McBroom also observed the involuntary hospitalization hearings, and took notes of the proceedings similar to those taken from the files. The observation of the commitment hearings was accomplished with the permission of Commissioner Donald M. Niles, the judicial officer at the proceeding, and two guardians ad litem, including Herbert I. Lakefish (intervenor), and in

accordance with the decision of the Domestic Relations and Family Court Committee.

The purpose of the project undertaken by Mr. Burnstin and Mrs. McBroom under the supervision of Professor Junker was not only to fulfill certain University of Washington Law School course requirements, but likewise to compile valuable data regarding commitment procedures under the statutes of the State of Washington, including evidence of what type of people are being committed and where they are from, what evidence was used to commit them, and for how long they were hospitalized and their rate of relapse or successful cure. The resulting information and statistical conclusions would be available to those such as the legislature of the State of Washington and others, for use in the enactment of legislation, as well as a supplement to other scholarly works in this field.

In order to determine the ultimate question on appeal of this case, it is necessary to ascertain as nearly as possible the intention of the legislature in the enactment of the statutes applicable to this portion of the mental illness commitment procedures. Two statutes of necessity must be considered jointly, for the information and data with which we are concerned are available to the same degree in both the mental illness commitment hearings, RCW 71.02.160, and in the files compiled as a result of the hearings, RCW 71.02.250. RCW 71.02.160 as originally enacted as Laws of 1949, ch. 198, § 9, p. 607, insofar as applicable here, provided:

> For the purpose of conducting hearings pursuant to commitment the Court may be convened at any time and place within the county suitable to the mental and physical health of the person, and such hearing *shall* be a regular *open* hearing as in any civil action, . . .

(Italics mine.) This statute was later amended by Laws of 1951, ch. 139, § 33, p. 352, into the form which it now takes, and insofar as applicable here, provided:

> For the purpose of conducting hearings and examinations under this act, court may be convened at any time and place within the limits of the county in which the court resides: *Provided,* That hearings and examinations

under this act *may* be *closed* to the general public unless the guardian, attorney, or guardian *ad litem* representing the alleged mentally ill person demands an open hearing as in other civil actions, or unless a jury is demanded.

(Italics mine.) The majority contends this statute "provides for closed mental illness hearings unless an open hearing is demanded." This is obviously an incorrect interpretation and becomes critical when, as here, it is in part the basis of the majority decision. It is obvious to me from a reading of this statute and its amendment that originally the legislature provided for open hearings, as evidenced by the language "shall be a regular open hearing," and thus left no discretion in the trial judge to close them. The amendment, however, leaves the hearings open, but allows the court in the exercise of its discretion to close them unless the guardian attorney or guardian ad litem of the patient demands that the hearing be an open one. The natural inference that arises from the language of the statute originally, as opposed to the amended language ("shall" vs. "may"), is that the judge is vested with a wide discretion so that he might conduct the hearings consistent with the patient's welfare, but at the same time allow observation of the hearings by those who have a legitimate interest in the proceedings, including doctors other than the ones directly involved with the patient, or nurses or social workers attached to the state hospital, or other individuals conducting works of scholarship for some future use. By the amendment of 1951, the legislature permitted the judge at his discretion to close the hearings, if not objected to by the guardian of the patient, so that idle curiosity seekers, neighborhood busybodies, or other intruders, whose purpose for being present was illegitimate and whose presence was unnecessary, would not be present to cause the patient any undue embarrassment or hardship. The statute does not require the judge to allow only those present who are absolutely necessary to the conduct of the hearings, such as witnesses, parties, and attorneys. This is apparent from the fact that by statute the hearings are open, but may be

closed by the judge if not objected to by the guardian of the patient. The majority, however, chooses to ignore this obvious interpretation of the statute in order to give some legal legitimacy to its decision.

The other statute that must be considered in this matter is RCW 71.02.250 which provides for disposition of the files in the mental illness cases. That statute as originally enacted was Laws of 1949, ch. 198, § 13, p. 609, and, insofar as applicable here, provided:

> All files in these cases shall be closed files subject to examination only by the person alleged therein to be mentally ill or his representative until such time as an order of mental illness and commitment is made, at which time those facts required for the Clerk's index as here-inafter set forth, shall become a public file. The County Clerk shall keep an index, alphabetically arranged, which shall show the name and age of each person examined and declared to be mentally ill, the date of the order of commitment or hospitalization and the name of the licensed hospital or sanitarium to which the person was ordered confined and cared for, or the name of the designated state hospital to which the person was committed. All medical reports and case histories shall be available as part of the record for the use of the hospital wherein the person is to be confined, but no such record shall be a part of the public records and their contents shall be deemed subject to the physician patient privilege.

Now, this statute in its original form provided that the files would be closed at all times except for examination by the patient, or his representative, and further provided that certain information relating to the name, age, date, and placement of commitment of the patient would be part of the public record in the clerk's office. It further provided, however, that the medical reports and case histories should be deemed subject to the physician-patient privilege. The court was given no discretion in these matters and the imposition of the physician-patient privilege by the legislature is evidence of its intent to strictly limit the inspection of the files. The statute was amended by Laws of 1951, ch. 139, § 38, p. 353, by eliminating the physician-patient privilege

provision regarding inspection of the medical files and records, thereby substantially reducing the secrecy surrounding the files. The amendment further provided that the files were closed subject to examination only on court order, with such examination not strictly limited to the patient or his representative. This statute was later amended by Laws of 1959, ch. 51, §§ 1 and 2, p. 418, to the extent that duly authorized representatives of the Department of Institutions would be permitted to examine data other than medical reports to determine the financial responsibility for the extensive care and treatment of the patient without first obtaining a court order. Section 1 provides:

All files in these cases shall be closed files subject to examination only on court order: *Provided, however,* That this shall not apply to duly authorized representatives of the department of institutions designated by the director insofar as it may be necessary for the department to examine data, other than medical reports, to determine financial responsibility for the expense of care and treatment of the patient. Where a person is found mentally ill the clerk shall cause the following facts to be noted in his probate docket: Name and age of such person, date of order of hospitalization, place of hospitalization, date of parole and date of discharge. Where a person is found not to be mentally ill the clerk shall cause such proceedings to be noted in an alphabetically arranged index, which index shall contain the following information: Name of person filed against, date of order dismissing proceedings, and probate cause number. This index shall be open to inspection only under court order. Nothing in this section shall be construed to prevent the forwarding of all case histories, physicians' reports, and other case data to the state hospital or other agency in which a mentally ill person may have been ordered hospitalized.

It is most apparent from reading the original statute covering these files and the amendment thereto, that the legislature has liberalized the extent to which inspection thereof would be allowed. The progression has been from a position where the court had no discretion to open the files, and examination limited to the patient or his representative, to one where the court could allow examination on its order

without limitation to the patient, as well as the statutory authorization of the inspection of certain portions of the files by the Department of Institutions without court order. Obviously the legislature has progressively vested wider discretion in the courts to determine on a case-by-case basis whether or not examination of the files should be allowed. The legislature's intent has been to prevent, as in the hearings, those with an invalid purpose from inspecting the file of a patient, and in this regard its policy toward mental illness hearings and files has been consistent. In addition, the information in the files relating to the name and age of the patient, the order of hospitalization date, place of hospitalization, date of parole, and date of discharge, is all part of the public record since it appears in the probate index in the county clerk's office, and is subject to public observation. When the foregoing statutes are compared to the adoption statute controlling disposition of the files, RCW 26.32.150, the difference in the degree of confidentiality of the files and discretion accorded the trial judge by the legislature becomes immediately apparent. The latter provides:

Unless otherwise requested by the adopted, all records of any proceeding hereunder shall be sealed and shall not be thereafter open to inspection by any person except upon order of the court for good cause shown, and thereafter shall be again sealed as before.

That language requiring good cause be shown before the files may be opened and requiring the sealing of the files is much more restrictive of the discretion accorded the court with regard to allowing examination of files by third parties. No such restriction appears in the mental illness statutes.

The committee in establishing the policy for the judges of the King County Superior Court, certainly had the foregoing statutes in mind when it formulated such policy permitting Professor Junker, Mr. Burnstin, and Mrs. McBroom to examine the 189 randomly selected files.

The purpose of the statute with reference to the privacy of the patient and the confidentiality of the files is to pre-

34

vent those with no useful purpose in mind from reading a patient's medical history and other data and associating it with that patient's name. The statute intends to protect the patient's medical history when associated with the patient's name, from the public, even though the patient's name and the fact of mental illness as found in the clerk's index is a matter of public record as authorized by the statute. Likewise, to read the medical history and data contained in the file without the name is not an invasion of privacy at least to any harmful extent unless that information is associated with the particular patient. Only then could there be any resulting invasion of the patient's rights. The order entered by Judge Ringold permitting the examination of the files by Professor Junker, Mr. Burnstin, and Mrs. McBroom explicitly provided that the confidentiality of the files and the anonymity of the patients be maintained. My brethren of the majority seem to feel that this is not an adequate safeguard for the maintenance of such confidentiality and anonymity, and that lacking such adequacy, it constitutes an abuse of discretion on the part of Judge Ringold. With this I cannot agree.

To assert an abuse of discretion implies a lack of use of any discretion at all. The exercise of an honest judgment, regardless of its erroneous appearance, is not an abuse of discretion, and simply because judicial opinion differs as to the exercise of one's discretion, does not make such exercise an abusive one. *Balise v. Underwood,* 71 Wn.2d 331, 428 P.2d 573 (1967); *Stroup v. Raymond,* 183 Pa. 279, 38 A. 626 (1897); *Belock v. State Mut. Fire Ins. Co.,* 106 Vt. 435, 175 A. 19 (1934); *Malfait v. Malfait,* 54 Wn.2d 413, 341 P.2d 154 (1959).

Judge Ringold, in my view, provided for adequate safeguards for the maintenance of confidentiality and anonymity in that a breach of the order and a disclosure of the names of the patients, or any other information in the file in association with a patient's name could result in the offender being cited for contempt of court. In addition, we must assume that Judge Ringold was satisfied as to the

reliability of the parties conducting the examination, as there appears nothing to suggest their unreliability, or any illegitimacy of purpose. The person who must determine the propriety of allowing someone to examine the files, and his purpose in doing so, is the individual judge, who has all the facts pertaining to such an examination including the reliability of the examiners before him at the local level, and it is improper for the Supreme Court to usurp the exercise of judicial discretion allowed him by statute. As a practical matter, all of these files are available for inspection by any clerk's office employee who wishes to do so. They are also available by statute to designated representatives of the Department of Institutions who can look at the information in the files.

If we are to assume that everyone who looks in the files is going to associate the information therein with the patient's name, then there is no hope of retaining the confidentiality of the files or the anonymity of the patients in association with the information. Mr. Burnstin and Mrs. McBroom are scholars engaged in graduate work not only for the purpose of their own education, but for the purpose of providing information resulting from their research which would benefit society generally. It must also be assumed, and I do assume, that Professor Junker is a reliable professor who is interested in proper supervision of this project with the assurance that it is conducted according to his scholastic aims. In the absence of a showing of unreliability of these scholars or an improper purpose of their project, the majority by its decision appears to be imposing its view of how the situation should have been handled, rather than determining whether or not Judge Ringold in light of the statute abused his discretion. I am unable to understand how the majority feels that any harm could result by permitting the project to be conducted. The names are not to be used in any publication or divulged to anyone. In addition to the order prohibiting it, there is no reason for these two scholars and their professor to divulge the names as it would be inconsistent with the project purposes.

On the other hand, the project provides a source of informa- tion and statistical study that can very likely be of value to other scholars in the same field, and conceivably to the legislature of this state in its constant review of the mental illness statutes. There must be a balancing between the mental patient's right of privacy on the one hand, and the public benefit to be derived from scholastic endeavors con- ducted by responsible, reliable, and concerned graduate student scholars, on the other hand. In a case such as this, the latter must prevail over the former where in fact proper safeguards are taken to insure that the benefit to the public would not be gained at the undue expense of the patient.

There is no requirement of due process that requires the giving of notice to the patient or anyone else concerned with the mental illness proceedings before a superior court judge may enter an order allowing the examination of a file pur- suant to such order. The majority cites no authority for such a procedural rule as set forth in its opinion simply be- cause there is no such authority. The majority is attempting to judicially graft some rules onto the procedures for dis- closures of the files other than those contemplated by the legislature. The legislature properly vested the trial court with discretion to be exercised on a case-by-case basis in determining the propriety of file disclosure.

The majority states that one of the reasons for the legis- lature's directing that the files be closed is that the witnesses, members of the family, and others interested in or partici- pating in the proceedings may act and speak with candor and forthrightness with knowledge that the confidentiality associated therewith would be kept secure. If that be the case, and I believe it is, then if notice is required to be given to the patient, as contended by the majority, must not no- tice be given to every witness present at the hearings or a participant whose name appears within the particular pa- tient's file, perhaps as a complaining witness who signed the application for commitment, or any other person at the trial all of whom might have based their participation on the confidentiality of the proceedings? Consequently, the

notice requirements as stated by the majority are not explicitly definitive so as to allow their practical application.

The requirements of notice, if extended to all those concerned with a mental patient's file, would result in a series of impractical delays and most probably and necessarily a full-scale hearing before a judge would be allowed to exercise his discretion to order a mental illness file opened as allowed him by statute. The practical effect would be to destroy his discretionary duty. In short, the majority's notice requirement lacks direction and practicality.

The majority's requirement of notice in all third-party research projects will effectively prohibit these projects in the future despite their potential value. The characteristic of randomness of the file selection is the essence of a research project such as the one before the court, and in a random selection of cases there will be a number of objections necessitating hearings under the guidelines established by the majority, indecisive though they may be. If the courts then prohibit the use of the files of the objecting patients, the systematic random selection of the files would be obstructed resulting in a frustration of the scientific authenticity of the study. Also, if we are to take the evidence in this case as indicative of the number of objections that would be made in future studies, then the hearings alone required by the majority guidelines would impose an unbearable burden on the trial courts of every jurisdiction in this state. This would result in an unjustified and regrettable termination of all academic studies of these files and remove certain situations in which the trial court is authorized to exercise a statutorily granted discretion. That apparently is what the majority really is attempting to accomplish. The effect of it is to amend the statute which constitutes judicial legislation of the most obvious kind.

Even assuming that Judge Ringold abused his discretion, nevertheless to make the temporary injunction permanent accomplishes no constructive purpose whatsoever at this late date, because the research project has substantially been completed, and the confidentiality of the files *legally*

breached. To impose the permanency of the injunction at this time would result only in the needless destruction of a scholarly work, the future use of which is of value to the general public. It is impossible by judicial decree in the form of a permanent injunction to extract from the minds of Professor Junker, Mr. Burnstin, and Mrs. McBroom the information they obtained from the files and hearings pursuant to the court order, and this will undoubtedly be the situation in nearly every case arising under these statutes which comes before this court. This is probably another reason the legislature granted a wide discretion to the trial judge in determining who should view the files. The publication of the results of that investigation would not include the names of the patients, and therefore would not constitute a violation of the statutory rights of privacy of the patients whose files were randomly selected. Thus, there is no need to prohibit the publication of the statistical results of that research. The purpose of the statute is not to prevent the publication of statistical information concerning some anonymous person. On the contrary, it is simply to prevent the examination of the files in conjunction with the names contained therein.

Apparently the majority feels that this court should establish certain guidelines for the trial judges of this state in its exercise of discretion in connection with the examination of mental illness files and attendance at mental illness hearings. If that be the case, although I do not agree that that is the proper function of this court in this area, nevertheless, this can be accomplished by affirming the judgment entered in the trial court and permitting the publication of the statistical and informational results of the project undertaken by Mr. Burnstin, Mrs. McBroom, and Professor Junker, which results contain no names of any mental patients and thus cannot be harmful to them or constitute an invasion of their privacy, and then further establish some broad guidelines in its opinion. In this way, the majority's objectives would be fulfilled, and at the same time the results of the project undertaken by the three scholars would

not be unnecessarily destroyed. This would better solve the problem raised by this case and would not be so patently unfair to those scholars who conducted their research in a legal manner, in good faith, and with no ulterior motives.

For the foregoing reasons I dissent and would affirm the judgment of the trial court on the basis that Judge Ringold was acting within the powers given him by the statute, and he in no way abused his discretion in the exercise of those powers.

FINLEY and NEILL, JJ., concur with WILLIAMS, J. Pro Tem.

FINLEY, J. (special concurrence in dissent)—I have signed and concur in the dissenting opinion by Williams, J. Pro Tem., because its reasoning or logic seems to me well nigh irrefutable. In particular, my concurring views can practically be put in a nutshell—I hope not an unnecessarily large or ponderous one. First, the key and crucial sentence of RCW 71.02.250 reads: "All files in these cases shall be closed files *subject to examination only on court order:* . . .". (Italics mine.) Second, the trial court, per Judge Ringold, in fact, issued an order authorizing the project of Professor Junker and his associates. Third, although not required by the statute, the order of Judge Ringold provided explicitly that anonymity and confidentiality would be preserved by the researchers as to the names—of the individuals—*i.e.,* the subjects of the mental illness files. Further, there is no proof whatsoever that this significant protective provision of Judge Ringold's order has been or even was about to be violated. Considering the first sentence of the statute, certainly in the light of the particular circumstances just mentioned, should put an end to this matter. In this context, and I think it is a realistic one, the fears and alarms of petitioners have something in common with an exercise in pyrotechnics involving considerable smoke but little or no fire. Likewise, I think, the majority views and result do well to escape a "much ado about nothing" category.

Perhaps it would have been better, and something may

be said, for the contention that Judge Ringold should not have heard and ruled on objections to his order. But, there is nothing new or novel or innately and conclusively improper or wrong in trial judges hearing and ruling upon objections made every day in the courts of this state to a great variety of orders made by them in a great variety of legal proceedings. Any needed safety valve in such instances, as in the instant case, is amply provided for by existing appellate or other judicial review. If the fountain of justice is to be kept pure and meaningful in serving the legitimate social aspirations and needs of all people, the law and its purported social ends must be subject at least periodically to careful scrutiny and evaluation. This, I believe, is the objective of the project by Professor Junker and his associates.

Thus, it seems to me quite compelling that the order issued by Judge Ringold was clearly authorized by the first sentence of RCW 71.02.250. The order for a temporary injunction should be dissolved and the order of Judge Ringold authorizing the research study and evaluation of mental illness proceedings should be sustained and affirmed by this court.

NEILL, J., and WILLIAMS, J. Pro Tem., concur with FINLEY, J.