# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                     )  No. 70558-0-I
        Respondent,  )
                     )  DIVISION ONE
  v.                 )
                     )  UNPUBLISHED OPINION
ROYAL WALLACE DRAYTON, )
                     )
        Appellant.   )  FILED: October 27, 2014

TRICKEY, J. — Where valid reasons exist for calling a witness who recants his testimony before trial, it is not improper for the State to examine that witness and impeach him with statements previously made to the police. Here, the witness gave substantive testimony identifying the victim and provided a connection between the victim and the defendant as well as a potential motive. Thus, impeachment was not the State's primary purpose for calling this witness.

Further, the defendant's location at the scene of the crime was established by 911 calls that he himself made to the police. Because the defendant identified himself and his location, there was no need to provide expert testimony to establish the defendant's location through cell phone towers.

In a statement of additional grounds, the defendant raises other issues, none of which have merit.

Affirmed.

## FACTS

At approximately 3:00 a.m., on September 15, 2012, Carlito Martinez made a 911 call informing the police that his cousin, Ricky Wilturner, was shot outside

the Noc Noc nightclub in downtown Seattle.[1] Wilturner was taken to Harborview Medical Center where he underwent surgery. Doctors were unable to retrieve the bullet.

Sergeant Christopher Hall arrived on the scene and spoke with a male later identified as Martinez.[2] The trial court admitted this conversation as substantive evidence as an excited utterance under ER 803(a)(2).[3] Martinez identified the shooter as someone named "Bob" with whom he and the victim had had an altercation over a recently purchased car.[4] Martinez said Wilturner had broken out the window of a burgundy Buick car that Bob was riding in.[5] A white Buick car, with glass shards on the ground nearby, was found in the vicinity.[6]

Officer Loyd then placed Martinez in his patrol car, which had audio/video recording equipment.[7] Martinez was not under arrest. The trial court admitted portions of the patrol car's recording under ER 801(d)(1)(iii) as a statement of identification.[8] Martinez identified Bob as having short hair, not cornrows.[9]

---

[1] 4 Report of Proceedings (RP) at 530, 602. Martinez identified himself on the 911 call as Carlito, but when questioned by police, identified himself as his brother, Alberto Martinez. 4 RP at 553.

[2] 5 RP at 672, 683, 692; Exhibit (Ex.) 16. Martinez was handed over to Officer Travis Loyd. 5 RP at 673, 678.

[3] ER 803(a)(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Defense counsel objected to the testimony as an excited utterance, but the trial court admitted it. Defense does not appeal that evidentiary ruling.

[4] 5 RP at 700, 729.

[5] 5 RP at 700, 729.

[6] 4 RP at 537-38.

[7] 5 RP at 723.

[8] ER 801(d)(1)(iii) provides in pertinent part that "[a] statement is not hearsay if . . . the statement is . . . (iii) one of identification of a person made after perceiving the person."

[9] 5 RP at 728.

Martinez also stated that he did not see the shooting, but saw a 1999 burgundy Buick with no rims taking off from the scene.[10]

Detectives transported Martinez to police headquarters where he was interviewed.[11] That interview was also video and audio recorded and a portion of the interview was admitted as substantive evidence as a statement of identification under ER 801(d)(1)(iii).

Martinez identified the shooter as someone who went by the moniker "SpongeBob" and that he was light-skinned, five feet six or seven inches tall, had short hair, and wore glasses.[12] Martinez chose Drayton from a photomontage prepared by the police.[13] Martinez also stated that Bob was wearing a gray and black sweater hoodie with blue pants and white Nikes.[14]

Drayton was arrested on September 18, 2012, outside of his home in Renton.[15] The burgundy Buick, described by Martinez, was found there. Police obtained a search warrant to search his home and the vehicle.[16] At the time Drayton was arrested, he had a cell phone on his person, which was admitted into evidence at trial.[17] Although no gun was found, a box of 9 mm ammunition was discovered with some bullets missing.[18]

---

[10] 5 RP at 729.
[11] 5 RP at 819; 6 RP at 1024.
[12] 6 RP at 1028-29; 1031.
[13] 6 RP at 1036; Ex. 42.
[14] 6 RP at 1029, 1031.
[15] 5 RP at 823, 839.
[16] 6 RP at 1050-51.
[17] 6 RP at 1052-53; Ex. 29.
[18] 6 RP at 899, 901-2.

3

The police impounded a maroon Buick Century which belonged to Drayton's girlfriend, Kelly Turner.[19] A search of the vehicle revealed glass shards in the creases of the car seats.[20] The window had been replaced approximately eight hours after the shooting by All-Star Auto Glass.[21]

Detectives Donald Waters and Thomas Janes interviewed Drayton.[22] Drayton asserted that at the time of the shooting he was home asleep. He repeatedly denied knowing anyone named Ricky Wilturner even after the detectives showed him a photograph of Wilturner.[23] Drayton admitted that he used to go by the name SpongeBob but that it was some time ago.[24]

At trial, two 911 calls placed six minutes before the shooting were admitted. Both of those calls were made from Drayton's cell phone.[25] In the first call, Drayton identifies himself telling the 911 operator that he is at Second Avenue and Pine Street and has just located his stolen car, which he recently purchased.[26] Drayton claimed his cousin took the car and he wanted the police to respond.[27]

Shortly thereafter, Drayton again calls 911 saying his cousin who stole the car was outside by the car at that moment.[28] Six minutes later, Martinez called

---

[19] 6 RP at 917, 921-22.
[20] 6 RP at 928-35.
[21] 7 RP at 1128-36.
[22] 5 RP at 823 (This interview was also audio and video recorded.); Ex. 25.
[23] 5 RP at 828, 831, 834.
[24] 5 RP at 832.
[25] 7 RP at 1096-1101; Ex. 15.
[26] 7 RP at 1097-98.
[27] 7 RP at 1099.
[28] 7 RP at 1099.

4

911 from the same location stating that his cousin had just been shot.[29] Neither the victim, Wilturner, nor Drayton were witnesses at trial.

Martinez testified at trial that he was drunk and hardly remembered anything from the night of the incident.[30] He did testify that he knew Drayton and referred to him as his cousin because they had grown up together.[31] Martinez identified the white Buick as a car that he had recently purchased before the shooting.[32] He denied buying the car with anyone else.

Martinez testified that he was at home with Wilturner and that the two had driven to the Noc Noc club in the white Buick.[33] Martinez testified that Wilturner had gone out for a smoke and that when Martinez stepped outside, Wilturner was walking toward him saying he was shot.[34] Martinez denied seeing Drayton outside the club.[35]

Martinez also claimed he had not spoken with Drayton that night and did not know that Drayton went by the nickname SpongeBob.[36] Martinez recalled speaking with the police that evening, but did not remember what he had told them.[37] He reviewed transcripts of those interviews with the police, but denied that

---

[29] 7 RP at 1102.
[30] 4 RP at 553-54, 570.
[31] 4 RP at 554, 567-68.
[32] 4 RP at 562.
[33] 4 RP at 571-73.
[34] 4 RP at 577, 579-82.
[35] 4 RP at 581.
[36] 4 RP at 554, 582.
[37] 4 RP at 588-90, 604-5.

they refreshed his memory.[38] Martinez did not remember identifying a suspect for the police or telling them about the circumstances that led to the shooting.[39]

The trial court denied a defense motion to preclude Martinez from testifying further, finding that Martinez provided substantive testimony, despite his recantation, and that calling Martinez permitted the State to introduce the statements of identification of the shooter.[40] The court permitted the State to enter the recorded statements that were admissible as substantive statements, but required the State to introduce impeachment evidence through the oral testimony of the police officers.[41] Evidence of calls made from Drayton's and Martinez's cell phones and the location of those cell phones when the calls were made were introduced at trial.

Drayton appeals his jury conviction for first degree assault while armed with a firearm and first degree unlawful possession of a firearm.[42] Drayton argues that the State improperly called Martinez as a witness when it was aware before trial that Martinez had recanted his statements to the police. Drayton also contends that the court erred in not requiring the State to present expert testimony to admit evidence obtained from Drayton's cell phone. In his statement of additional grounds, Drayton maintains there is insufficient evidence to support his convictions and that the trial court made several erroneous evidentiary rulings.

---

[38] 4 RP at 590.
[39] 4 RP at 602-15.
[40] 4 RP at 623-25.
[41] 5 RP at 652-53.
[42] Clerk's Papers at 128.

ANALYSIS

Witness Testimony

Under ER 607, "[t]he credibility of a witness may be attacked by any party, including the party calling the witness."

Citing State v. Lavaris, 106 Wn.2d 340, 721 P.2d 515 (1986), Drayton argues that the prosecutor called Martinez to testify primarily for the purpose of eliciting testimony that could later be contradicted by otherwise inadmissible hearsay testimony elicited from the State's other witnesses.

In Lavaris, the State called the defendant's accomplice to a murder as a witness. The accomplice who testified to events leading up to the murder but did not incriminate the defendant. Lavaris, 106 Wn.2d at 341. The State then called a detective to impeach the accomplice by describing the accomplice's confession, which incriminated both the defendant and the accomplice. Lavaris, 106 Wn.2d at 342-43, 346. Because the accomplice testified to events leading up to the murder, the Supreme Court held that the State did not call the accomplice for the primary purpose of eliciting the detective's otherwise inadmissible testimony. Lavaris, 106 Wn.2d at 346-47.

Likewise, here, the State elicited Martinez's version of the events leading up to and following the shooting that occurred outside the nightclub. Martinez testified that he knew both the victim and Drayton. Martinez's testimony that he had just purchased a car could be linked to Drayton's 911 call in which he requested police assistance to recover his recently purchased car that had been stolen. As in Lavaris, under these circumstances, the court's conclusion that the

State's primary purpose in calling the witness was not to elicit his testimony in order to impeach him with otherwise inadmissible testimony was not error. 106 Wn.2d at 347.

This case is more similar to State v. Hancock, 109 Wn.2d 760, 748 P.2d 611 (1988), an indecent liberties case. There, the defendant's wife claimed not to remember telling the detective that she suspected that "something was going on between her husband and B" and was afraid of him. Hancock, 109 Wn.2d at 762. In rejecting Hancock's argument that the State knew the wife would not favorably testify, the court noted that "the State could not have been certain that [the wife's] testimony would change. The State was entitled to expect her to testify under oath no differently from the apparently voluntary statement she gave to the detective." Hancock, 109 Wn.2d at 765. The State was similarly entitled to call Martinez in Drayton's trial as well.

Cell Phone Data

The police obtained a search warrant for records of the call logs made from Drayton's cell phone from the date of the incident up to the time that Drayton was arrested.[43] In addition to the call logs, the cell phone service provider, Sprint, sent the locations from which the calls were made. Police also submitted a report of the phone logs, messages, and contacts contained in Drayton's cell phone.[44]

Those records contained outgoing call numbers, incoming call numbers, the start and end time of each call, the duration, the cell phone tower used at the start of the call, and the cell phone tower pinged at the end of each call as well as the

---

[43] 6 RP at 1053.
[44] 6 RP at 1057-59.

location of the cell phone towers for Sprint in the Seattle/Eastside area.[45] Those records were admitted as a business record without objection.[46]

In addition, the police also used a device from the Cellebrite Company enabling them to download all the information stored on the cell phone into a printed form, including photographs, text messages, call logs, and Drayton's contacts list.[47]

Defense counsel objected to the information coming into evidence without expert testimony.[48] The court admitted the testimony finding that such information was similar to a photocopy.[49] Moreover, the evidence downloaded from the cell phone was easily verified by checking the phone itself. Based on the argument that cell phone tower mapping was common knowledge and the jurors could understand the evidence presented, the court permitted the testimony.[50]

This court reviews evidentiary rulings for abuse of discretion. State v. Roberts, 142 Wn.2d 471, 520, 14 P.3d 713 (2000). A court abuses its discretion when it exercises discretion on untenable grounds or for untenable reasons. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

The phone dump record obtained by the police themselves through the Celebrite software program was data stored on the cell phone in printed form. That information was easily verified by viewing the phone. A detective testified how he obtained the information and that the information on the sheet of paper

---

[45] 6 RP at 1056.
[46] RCW 10.96.030.
[47] 6 RP at 1009, 1011.
[48] 5 RP at 760.
[49] 5 RP at 846.
[50] 6 RP at 1005.

represented data that was found and could still be retrieved from Drayton's cell phone.

In State v. Bradford, 175 Wn. App. 912, 919, 308 P.3d 726 (2013), review denied, 179 Wn.2d 1010, 316 P.3d 494 (2014), this court admitted a report generated by the police conducting a "phone dump" of the defendant's cell phone. The procedure generated a 280-page report itemizing each of the text messages that were sent or received during a specific time frame. A condensed version of the report was admitted. Here, like the police officer in Bradford, the officer testified that a "phone dump" is a method used to retrieve messages sent to and from a cell phone. There was no error.

The business records obtained from Sprint included a cell phone tower map with the particular cell phone towers that were pinged when the cell phone was used.

A harmless error under the constitutional standard occurs if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. State v. Guloy, 104 Wn.2d 412, 425, 70 P.2d 1182 (1985). The reviewing court must look at the "untainted" evidence to determine if that evidence is so overwhelming that it necessarily leads to a findings of guilt. Guloy, 104 Wn.2d at 426. Here, Drayton's own 911 calls put him at the scene of the crime, contradicting his statement to the police that he was home at the time of the shooting. Thus, we need not decide whether an expert witness was required for the cell phone tower testimony; any error in its admission is harmless.

Statement of Additional Grounds

Drayton first argues that the evidence was insufficient evidence to convict him. When reviewing a claim of insufficient evidence, we must determine, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Brockob, 159 Wn.2d 311, 336, 150 P.3d 59 (2006). We draw all reasonable inferences from the evidence in the prosecution's favor and interpret the evidence most strongly against the defendant. State v. Hosier, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). Circumstantial evidence is as probative as direct evidence. State v. Goodman, 150 Wn.2d 774, 781, 83 P.3d 410 (2004).

Here, the State produced evidence that Drayton was at the scene and that he had motive because he thought Wilturner had stolen his car. Drayton made the two 911 operator calls. Drayton denied knowing Martinez, but the cell phone data obtained from Sprint indicated that they in fact had been in close contact.[51]

Martinez's identification of SpongeBob as the shooter, along with the detectives' familiarity with that moniker, led to a photomontage from which Martinez picked out Drayton. There was testimony that Drayton was in the area and that Drayton's car was identified driving away after the shooting. The evidence was sufficient.

Drayton next argues that the trial court erred in admitting evidence of glass shards found in the automobile and a box of ammunition recovered from Drayton's house during a search under a warrant.

---

[51] 6 RP at 1053, 1057, 1059.

A trial court's decision regarding the admission of evidence will not be reversed absent an abuse of discretion. State v. Mee Hui Kim, 134 Wn. App. 27, 41, 139 P.3d 354 (2006) (citing State v. Swan, 114 Wn.2d 613, 658, 790 P.2d 610 (1990)). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Junker, 79 Wn.2d at 26.

Evidence is admissible if it is relevant unless, under ER 403, its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Under ER 401, "[e]vidence is relevant if it has any tendency to make any fact that is of consequence to the case more or less likely than without the evidence." State v. Thomas, 150 Wn.2d 821, 858, 83 P.3d 970 (2004).

The police discovered a box of ammunition in Drayton's kitchen cabinet.[52] The ammunition was 9 mm.[53] The trial court ruled that evidence that Martinez knew Drayton to have a 9 mm black gun was admissible.[54] The ammunition box with missing bullets was relevant.

The glass shards are likewise relevant. Evidence was introduced that the three were fighting over the car they had purchased together.[55] Martinez told the police that Wilturner refused to let Drayton take the car and that he smashed Drayton's passenger car window in. Glass shards were discovered near the white Buick recently purchased by Martinez. Glass shards were found in Drayton's car

---

[52] 6 RP at 899.
[53] 6 RP at 901.
[54] 4 RP at 317-318, Ex. 9 (not admitted).
[55] 7 RP at 1109.

and evidence was presented that that the car window had been replaced the day of the shooting. These pieces of evidence are relevant in helping to determine motive and the identification of the shooter. As such, the trial court did not abuse its discretion.

Affirmed.

Trickey, J

WE CONCUR:

Leach, J.

Becker, J.