FILED
COURT OF APPEALS
DIVISION II

2014 DEC 30 AM 9: 45

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON. | No. 44561-1-II |
| Respondent, | |
| v. | |
| JACOB BENJAMIN MATTILA, aka JACOB BENJAMIN MATILLA, | Consolidated with: |
| Appellant. | |
| STATE OF WASHINGTON, | No. 44621-9-II |
| Respondent, | |
| v. | |
| MYKELL ALEX BRU, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — A jury found Jacob Benjamin Mattila and Mykell Alex Bru guilty of residential burglary. The jury also found Mattila guilty of first degree burglary, an additional count of residential burglary, two counts of theft of a firearm, first degree theft, and unlawful possession of a firearm. Mattila appeals, arguing that he received ineffective assistance of counsel and that there was insufficient evidence to support the jury's verdict finding him guilty of unlawful possession of a firearm. Bru also appeals, arguing that the trial court erred by denying his motion to continue trial. Mattila and Bru both argue that prosecutorial misconduct denied them a fair trial and that the trial court improperly imposed legal financial obligations. The State concedes that there was insufficient evidence to support the jury's verdict finding Mattila guilty of unlawful possession of

a firearm, and we accept the State's concession. Mattila's and Bru's remaining claims lack merit. Accordingly, we vacate Mattila's conviction for unlawful possession of a firearm and remand for resentencing, and we affirm Mattila's remaining convictions and Bru's residential burglary conviction.

## FACTS

On October 16, 2012, P.M.[1] was home alone. The doorbell rang, but P.M. did not answer the door because she did not recognize the man standing outside. P.M. called her mother and told her there was a stranger at the door. P.M.'s mother, Jennifer Mock, told P.M. not to answer the door. A few minutes later, P.M. saw someone in the house. P.M. hid in the pantry and called 911. From the window in the pantry, P.M. saw a tan car with a dark stripe and described the car to the dispatcher. P.M. also saw a man in the house who was not the man who rang the doorbell. When P.M. thought the men were away from the pantry, she ran out of the house and hid behind a tree in the front yard.

Clark County Sheriff's Deputy Rick Buckner responded to P.M.'s 911 call. When he arrived at the house, he saw Mattila sitting in a tan Honda with a dark stripe down the side. Buckner asked Mattila what he was doing there, and Mattila responded that he was trying to find his girlfriend's house. Buckner placed Mattila in his police car while he figured out what was going on. About the same time, Mock returned home and ran into the house. When Mock came back outside, she told Buckner that her home had been burgled. Buckner called for additional

---

[1] Because P.M. is a minor, we use her initials to protect her privacy.

2

units to respond, left Mattila in the car, and entered the house to ensure that there were no additional suspects inside.

While at the scene, Buckner determined that the tan Honda was stolen. They obtained the car owner's permission to search the car. In the car, officers found stolen property, including firearms in the trunk.

Mattila gave a statement implicating himself in several other burglaries. One of the burglaries to which Mattila admitted involvement occurred in Washougal just prior to the burglary at the Mock house.

Several days after the burglary, Mock found a cigarette in her bathroom. She turned the cigarette over to the sheriff's office. The forensics lab determined that the cigarette contained Bru's deoxyribonucleic acid (DNA).

The State charged Mattila with first degree burglary (count one), two counts of residential burglary (count two and three), possession of a stolen vehicle (count four), two counts of theft of a firearm (count five and seven), first degree theft (count six), and unlawful possession of a firearm (count eight). The State charged Bru with residential burglary (count three), first degree burglary (count nine), and theft of a firearm (count ten). Mattila and Bru were tried together.

On Monday, February 11, 2013, the first day of trial, Bru moved for a continuance because he had just received the DNA report the previous Thursday afternoon. The State explained that the parties had initially agreed to a continuance. However, at the readiness hearing on the previous Thursday, Bru called the case ready for trial knowing that the State was still waiting for the DNA report. The State received the DNA report that afternoon and immediately forwarded it to Bru.

3

Furthermore, there was supposed to be a hearing on a motion to continue the next day (Friday), but Bru did not appear. Bru argued that the continuance was necessary because he wanted to obtain an expert to respond to the State's expert. The trial court denied the continuance because Bru was aware that the DNA report was pending and called the case ready.

After a CrR 3.5 hearing, the trial court concluded that Mattila's statements to the police were admissible. At trial, Clark County Sheriff's Office Deputy Robin Yakhour testified regarding a redacted version of Mattila's statements.[2] Mattila stated that he was the lookout and driver for the burglaries. He also stated that the men who actually performed the burglaries generally looked for guns and gold to steal from the homes they burglarized. Deputy Yakhour testified that the following exchange took place in regard to the Washougal burglary:

> I asked, "You sat out there and basically you're the lookout again?"
> Mr. Mattila replied, "Yes."
> I asked, "They load stuff into the trunk?"
> Mr. Mattila says, "Yes."
> "Did they tell you what they acquired in the house?" I asked.
> He says, "No."
> I said, "Not a word?"
> He said, "They—they don't—they said something about not enough jewelry."
> I said, "Okay." I asked, "So, did they tell you there were guns in the house?"
> Mr. Mattila replied, "Um—because yes, um, one of them was like—he's like, 'Hey, there's—' I said, 'Did you guys get what you—did you guys get—what did you guys get?' And they were like, 'Oh, there's some jewelry and like that.'"

2B Report of Proceedings (RP) at 508-09.

At closing argument, the prosecutor argued:

---

[2] Because Mattila and Bru were tried together, Mattila's statements were required to be redacted to comply with *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). There is no issue regarding the admission of the statements.

These two Defendants had zero regard for other people's property, their sense of security, or their right to be safe in their own homes. They didn't care that ten-year-old [P.M.] was home all alone that day, terrified, hiding in the pantry. They didn't consider how her mother would feel about leaving her daughter home alone that day, even for a few minutes.

. . . .

These two didn't care that the victims of their crimes worked hard to obtain the property that they had. They didn't care that those things meant something to them, and they didn't care how these people would feel after their homes had been invaded by complete strangers to them. It meant nothing to them, nothing.

3 RP at 658, 659-60. The prosecutor went on to argue that Mattila was guilty of unlawful possession of a firearm on the date of the Washougal and Mock burglaries because the guns were in the trunk of the car he was driving and because he knew that the goal of the burglaries was to steal gold and guns. Neither Mattila nor Bru objected during the prosecutor's closing argument.

The jury found Mattila guilty of first degree burglary, two counts of residential burglary, two counts of theft of a firearm, first degree theft, and unlawful possession of a firearm. The jury also found Bru guilty of residential burglary. The trial court imposed standard range sentences and legal financial obligations. Mattila and Bru appeal.

ANALYSIS

A.    MATTILA'S ISSUES

1.    Ineffective Assistance of Counsel

A defendant claiming ineffective assistance of counsel has the burden of establishing that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defendant's case. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 700. Counsel's performance is deficient if it falls below an objective

5

standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995). Our scrutiny of counsel's performance is highly deferential and we strongly presume reasonableness. *McFarland*, 127 Wn.2d at 335. To establish prejudice, a defendant must show a reasonable probability that the outcome of the trial would have differed absent counsel's deficient performance. *McFarland*, 127 Wn.2d at 337.

Mattila contends that he received ineffective assistance of counsel because defense counsel did not move to suppress the evidence found in the car or Mattila's statements. Mattila asserts that he was unlawfully arrested because, at the time Buckner arrested him, Buckner did not have probable cause to believe that a crime had been committed.

When an ineffective assistance of counsel claim is based on a failure to move to suppress evidence, the defendant must show that the motion to suppress would have been granted. *McFarland*, 127 Wn.2d at 333-34. However, "[t]hat standard often cannot be met when the record lacks a factual basis for determining the merits of the claim." *State v. Walters*, 162 Wn. App. 74, 81, 255 P.3d 835 (2011) (citing *McFarland*, 127 Wn.2d at 337-38). Here, the record before us lacks the factual basis for determining whether a claim that Mattila's arrest was unlawful would have been successful.

Because Mattila never challenged the lawfulness of his arrest, the parties never developed the record necessary to determine when Mattila was actually arrested. Mattila argues that he was arrested when Buckner detained him by placing Mattila in his vehicle. The record is clear that, at that point, Mattila was not free to leave. But, an officer may detain a person, without formal arrest, for further investigation if the officer has a reasonable suspicion that the person has been involved

in criminal activity. *State v. Day*, 161 Wn.2d 889, 895, 168 P.3d 1265 (2007). Here, Mattila was outside of the Mock house in the same car P.M. described when she called 911. A trial court could have determined that Buckner reasonably detained Mattila to further investigate whether a burglary had occurred. However, the issue before the trial court at the CrR 3.5 hearing was whether Mattila was properly read his *Miranda* rights prior to giving his statements to the police; the trial court was not asked to determine whether Mattila's arrest was lawful. Therefore, the record is not fully developed as to the circumstances regarding Mattila's detention and arrest, or the officers' search of the vehicle. The facts here have not been settled, the parties have not had an opportunity to develop their arguments, and the trial court has not made factual findings for our review. Accordingly, Mattila has failed to meet his burden to show counsel's performance was deficient because the record is insufficient for us to determine whether the motion to suppress would have been granted.[3]

2.      Sufficiency of the Evidence – Unlawful Possession of a firearm

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. All "reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant."

---

[3] When a claim rests on matters outside the record, "a personal restraint petition is the appropriate vehicle for bringing those matters before the court." *McFarland*, 127 Wn.2d at 338.

*Salinas*, 119 Wn.2d at 201. Circumstantial and direct evidence are deemed equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

To convict Mattila of unlawful possession of a firearm, the State was required to prove that Mattila knowingly owned, possessed, or controlled a firearm, and that Mattila had been convicted of a serious offense. RCW 9.41.040(1). Knowing possession is an essential element of unlawful possession of a firearm. *State v. Anderson*, 141 Wn.2d 357, 366-67, 5 P.3d 1247 (2000). Mattila was charged with unlawful possession of a firearm on October 16, the date of the Washougal and Mock robberies. Therefore, the State had to present sufficient evidence to prove that the guns were in the trunk of the car Mattila was driving and that Mattila knew the guns were in the trunk. The State concedes that there was not sufficient evidence to prove that Mattila knew that the guns were in the trunk, and therefore, there was not sufficient evidence to support the jury's verdict finding Mattila guilty of unlawful possession of a firearm. We agree.

Here, the evidence presented at trial established that the men committing the Washougal burglary stated that there was not enough jewelry in the house; there was no evidence that Mattila was told they stole guns from the house. The inference that, because the goal was usually to steal gold and guns, Mattila must have known there were guns in the car, is not sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Mattila knew the guns were in the trunk. Accordingly, we accept the State's concession and vacate Mattila's conviction for unlawful possession of a firearm.

B.     BRU'S MOTION TO CONTINUE[4]

The decision to grant or deny a continuance rests within the sound discretion of the trial court, and we will not disturb the trial court's decision unless the defendant can show that the trial court's decision was "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. Downing*, 151 Wn.2d 265, 272-73, 87 P.3d 1169 (2004) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). "In exercising discretion to grant or deny a continuance, trial courts may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure." *Downing*, 151 Wn.2d at 273 (citing *State v. Eller*, 84 Wn.2d 90, 95, 524 P.2d 242 (1974); RCW 10.46.080; CrR 3.3(f)). The mere existence of surprise and diligence does not require reversing a trial court's decision denying a motion to continue in order for the defense to secure expert testimony. *Downing*, 151 Wn.2d at 274.

Bru argues that the trial court abused its discretion when it denied his motion to continue because the prosecutor did not provide him with the DNA lab report until just before trial and he did not have time to have an expert review the results. But Bru knew that the DNA results would be available the afternoon after the readiness hearing, and he decided to call the case ready for trial. And, Bru did not make any effort to contact an expert or present an offer of proof as to what

---

[4] In addition to arguing that the trial court erred by denying his motion to continue trial and by imposing legal financial obligations, Bru asserts the trial court erred by refusing to grant him a new trial. Presumably, Bru is referencing the trial court's orders denying Bru's CrR 7.5 motion. However, Bru offers no argument or authority addressing his assignment of error; Bru does not even reference his post-conviction motions in his analysis. Accordingly, we do not consider Bru's assignment of error referencing the trial court's decision on his CrR 7.5 motion. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

9

he would present expert testimony for. The trial court considered the fact that Bru was not surprised by the evidence because he knew that it was going to be disclosed shortly at the time he called the case ready. The trial court did not act unreasonably when it determined that Bru was not surprised by the evidence and that Bru did not act diligently by calling the case ready when he was aware the report was about to be disclosed. We affirm the trial court's decision to deny Bru's motion to continue on the morning of trial.

## C.   JOINT ISSUES

### 1.   Prosecutorial Misconduct

To prevail on a claim of prosecutorial misconduct, Mattila and Bru must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012) (citing *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011)). First, we must determine whether the prosecutor's conduct was improper. *Emery*, 174 Wn.2d at 759. If we determine that the prosecutor's conduct was improper, we then determine whether the prosecutor's improper conduct resulted in prejudice. *Emery*, 174 Wn.2d at 760-61. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Emery*, 174 Wn.2d at 760.

If the defendants did not object at trial, the defendants are deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice. *Emery*, 174 Wn.2d at 760-61 (citing *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). Under this heightened standard of review, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect

10

on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455).

In closing argument, prosecutors are afforded wide latitude to draw and express reasonable inferences from the evidence. *State v. Reed*, 168 Wn. App. 553, 577, 278 P.3d 203, *review denied*, 176 Wn.2d 1009 (2012). Prosecutors may not rely on facts outside the evidence or use arguments calculated to inflame the passions or prejudices of the jury. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012); *State v. Jones*, 71 Wn. App. 798, 808, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994). We do not look at the comment in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007), *cert. denied*, 554 U.S. 922 (2008). We presume the jury follows the trial court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010).

> Mattila and Bru challenge the following portion of the prosecutor's closing argument:
>
> These two Defendants had zero regard for other people's property, their sense of security, or their right to be safe in their own homes. They didn't care that ten-year-old [P.M.] was home all alone that day, terrified, hiding in the pantry. They didn't consider how her mother would feel about leaving her daughter home alone that day, even for a few minutes.
>
> . . . .
>
> These two didn't care that the victims of their crimes worked hard to obtain the property that they had. They didn't care that those things meant something to them, and they didn't care how these people would feel after their homes had been invaded by complete strangers to them. It meant nothing to them, nothing.

3 RP at 658, 659-60.

First, Mattila and Bru argue that the prosecutor committed misconduct by relying on facts outside the evidence; specifically, that Mattila and Bru did not care about P.M. being alone or

terrified. The prosecutor did not improperly rely on facts outside the record. P.M. testified that she believed the man who rang the doorbell saw her looking out the window. 1B RP 273. The prosecutor did not commit misconduct by inferring that the burglars then knew she was there and broke into the house anyway. It was also reasonable to infer that, if Mattila and Bru knew P.M. was in the house, they would know she would be scared or terrified by strange men breaking into her house.

Second, Mattila and Bru argue that the prosecutor improperly appealed to the jury's passions and prejudice. The prosecutor's argument was not improper. In *State v. Brown*, 132 Wn.2d 529, 562-63, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998), our Supreme Court held that statements asking the jury to personalize crimes were not improper. In *Brown*, the prosecutor stated:

> I've sort of lived with Holly [Washa] over the last two years or so preparing for this case, and perhaps I've personalized her a little bit. Maybe by the time this trial is over, you will know enough about her that maybe you'll personalize her a little bit. The one thing I do hope though is that justice can be done by the end of this trial and we can put Holly [Washa] to rest.
>
> . . . .
>
> I want to assure you at the end of this case you're not going to look at me and say, "Did he do it?" I suggest you're going to look at me and you're going to say, "How could he have done it?" And, you know, that's one question that I won't be able to answer for you. I don't have to answer it for you. I can't imagine how any person could have done this to Holly Washa or to any other living human being. How could he have done it?

132 Wn.2d at 562. The court held that the prosecutor's statements were not improper. *Brown*, 132 Wn.2d at 563. Here, the prosecutor reminded the jury that property crimes have victims. The prosecutor did not improperly urge the jury to find guilt based on passions or prejudice. And, the remainder of the prosecutor's closing argument focused on applying the facts to the law as stated

in the jury instructions. Like the prosecutor in *Brown*, the prosecutor's comments in this case were not improper.

2.    Legal Financial Obligations

Mattila and Bru make two arguments regarding their allegation that the trial court improperly imposed legal financial obligations. First, they argue that the trial court impermissibly imposed the cost of a jury trial by including a "trial per diem" fee in their legal financial obligations. Second, they argue that the trial court violated their right to counsel by imposing costs for assigned counsel without sufficient evidence supporting the trial court's finding that they had the present or likely future ability to pay legal financial obligations. Their first claim lacks merit; their second claim is not properly before this court. Therefore, we affirm the trial court's imposition of legal financial obligations.

a.    *"Court Appointed Attorney and Trial Per Diem" Fee*

Mattila and Bru contend that the trial court exceeded its statutory authority because the trial court may not impose costs for exercising their constitutionally guaranteed right to a jury trial in excess of the $250 jury trial fee expressly authorized by statute. However, the $1,500 legal financial obligation is assigned to "court appointed attorney and trial per diem." CP (Mattila) at 11; CP (Bru) at 18. RCW 9.94A.030(30) authorizes the trial court to impose legal financial obligations for "court-appointed attorneys' fees, and costs of defense." Therefore, because the costs of a court appointed attorney are statutorily authorized legal financial obligations, the trial court did not exceed its statutory authority to impose legal financial obligations.

13

No. 44561-1-II/
No. 44621-9-II

      b.    *Ability to Pay*

Mattila and Bru argue that the trial court may not impose court-appointed attorney costs unless it finds that the defendant has the present or future ability to pay. They are correct. *Fuller v. Oregon*, 417 U.S. 40, 45, 94 S. Ct. 2116, 40 L. Ed. 2d 642 (1974); RCW 10.01.160(3). But the record shows that the trial court did find that Mattila and Bru had the present or future ability to pay.

It appears that Mattila and Bru are actually arguing that the trial court's finding is not supported by substantial evidence.[5] However, this issue is not properly before us.

Under *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492, *review granted*, 178 Wn.2d 1010 (2013), Mattila and Bru may not raise a challenge to the trial court's finding that they have the present or future ability to pay for the first time on appeal. And, under *State v. Lundy*, 176 Wn. App. 96, 108-09, 308 P.3d 755 (2013), their claim is not ripe for review until the State attempts to collect the ordered legal financial obligations. Accordingly, Mattila's and Bru's claim that the trial court erred by imposing court-appointed attorney costs is not properly before this court.

---

[5] For example, Mattila argues:

> In this case, the sentencing court entered such a finding without any support in the record. Indeed, the record suggests that Mr. Mattila lacks the ability to pay the amount ordered. The court found Mr. Mattila indigent at the end of the proceedings. His lengthy incarceration and felony conviction will also negatively impact his prospects for employment. Accordingly, Finding No. 2.5 of the Judgment and Sentence must be vacated.

Br. of Appellant (Mattila) at 20 (citations omitted).

14

No. 44561-1-II/
No. 44621-9-II

We vacate Mattila's conviction for unlawful possession of a firearm and remand for resentencing. We affirm Mattila's other convictions and Bru's residential burglary conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, P.J.

Sutton, J.

15